**In re Speros D. HOMER, Jr. and Loretta K. Homer a/k/a Loretta K. Fain, Debtors.**

**COMMONWEALTH LAND TITLE INSURANCE COMPANY and First Union Mortgage Corporation, Plaintiffs,**

v.

**Speros D. HOMER, Jr., Defendant.**

**Bankruptcy No. 92–75162.**
**Adv. Nos. 92–6939 and 92–7063.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

June 6, 1994.

### DECISION AND ORDER DETER-MINING DISCHARGEABILI-TY OF INDEBTEDNESS

JAMES E. MASSEY, Bankruptcy Judge.

In these cases challenging the dischargeability of claims on grounds of fraud, the Debtor contends that the issue is simply one of responsibility. He denies having read documents, including a residential loan application, that bear his signature. He denies having known that the loan broker submitted the residential loan application to a lender to obtain a loan. Instead, he testified that he believed the application was to be used merely to find out whether he "qualified" for a loan. He denies having had knowledge of an encumbrance against the property securing the loan at the time he received the loan proceeds. In short, the Debtor denies all responsibility for his actions concerning the loan, except ordinary liability on the note. Even if he is responsible for having made deceitful misstatements, the Debtor contends that the Plaintiffs failed to rely, or were irresponsible in relying, on those misstatements.

The creditors contend that this case is about integrity. They accuse the Debtor of knowingly and fraudulently misleading them about his financial and personal situations.

They contend that they reasonably relied to their detriment on incorrect information that he provided to them.

Thus, to adjudicate this dispute, the court must decide who bears what responsibility for actions taken or omitted by the parties and who is telling the truth. The court has carefully considered the evidence presented at the five-day trial and concludes that the Debtor must bear responsibility for his reckless failure to read the loan application. First Union Mortgage Corporation reasonably relied on misrepresentations concerning his residence and marital status but did not reasonably rely on misstatements regarding his financial condition. In addition, the Debtor intentionally breached a duty to inform the Plaintiffs that there was a lien on the property securing the loan. The Plaintiffs reasonably relied upon the resulting false representation. Their claims are therefore not dischargeable.

## I. FINDINGS OF FACT

### A. The Parties and the Claims.

Speros D. Homer, Jr. ("Homer" or "Debtor"), an attorney admitted to practice in Georgia, has practiced business and bankruptcy law for over 20 years. Having advised clients concerning the raising of capital through real estate loans, he is generally familiar with procedures for processing and closing such loans.

On April 10, 1990, (the "Closing Date"), Homer borrowed from Plaintiff First Union Mortgage Corporation ("First Union") the sum of $337,500, evidenced by a note in that amount (the "Note"). Residential property at 4265 Gatewood Lane, Duluth, Georgia (the "Residence"), titled in Homer's name, secured the loan. First Union disbursed the net loan proceeds to Homer on April 16, 1990 (the "Disbursement Date"). As a condition of closing, Plaintiff Commonwealth Land Title Insurance Company ("Commonwealth") issued a title insurance policy naming First Union as the insured. The policy showed that First Union held a first priority security deed on the Residence. In fact, Homer's wife, Helen Homer had recorded a Lis Pen-

dens against the Residence in February 1990.

Within four months of the Disbursement Date, Homer defaulted on the loan. First Union and Commonwealth were unaware on the Closing and Disbursement Dates that the Homers were parties to a divorce action in the Superior Court of Gwinnett County, Georgia (the "Superior Court"). The title report relied upon by the closing attorney had failed to mention the Lis Pendens.

On March 4, 1991, First Union sued Homer and his ex-wife in the Superior Court to quiet title to the Residence. Pursuant to the title policy, Commonwealth provided First Union with legal counsel to challenge Helen Homer's interest in the Residence and thereby incurred legal expenses totaling $20,-324.54. In a judgment entered on October 4, 1991, the Superior Court found that First Union was "on notice that the Defendant Helen T. Homer was claiming an interest" in the Residence and declared that Helen Homer's interest in the Residence was superior to that of First Union. First Union did not appeal that judgment. To induce Helen Homer to satisfy the Lis Pendens, Commonwealth, as First Union's title insurer, paid her the sum of $70,000 on November 27, 1991.

In a letter to Homer dated January 14, 1992, First Union through its attorneys, accelerated the Note and demanded that he pay it within ten days of receipt of the letter to avoid statutory attorneys' fees. Homer did not pay the Note. On February 4, 1992, First Union conducted a nonjudicial foreclosure sale at which it purchased the Residence for $310,000. It then brought an action against Homer in the Superior Court to confirm the sale. The Superior Court entered an order on April 29, 1992, confirming the foreclosure sale. The sum of the principal balance of the Note plus the escrow payments advanced by First Union was $344,139.13 on the date of foreclosure. Accrued interest totaled $57,363.84 and attorneys' fees amounted to $40,175.30 as of that date. First Union applied the sale price first to interest, attorneys' fees, and escrow advances and then to principal, leaving a principal balance remaining of $131,678.27. The

Note bears interest, both before and after default, at the rate of 11.25% per annum. First Union computed accrued interest since 1992 using a 360-day year; the Note contains no such provision.

On September 17, 1992, Homer filed a petition under Chapter 7 of the Bankruptcy Code. First Union and Commonwealth filed timely complaints seeking judgments against him for alleged damages and determinations that the alleged debts of Homer to each of them are nondischargeable. On February 2, 1994, this court entered an order denying the Debtor's motion to dismiss for lack of standing the case brought by Commonwealth in Adversary Proceeding No. 92–6369. The court consolidated the adversary proceedings for trial.

## B. *The Divorce Proceeding and Settlement.*

Homer and Helen Homer were married in 1964 and separated in August 1989. The marriage was a troubled one, and at its end Homer disliked his wife intensely. On advice of his doctor, Homer moved out of the Residence into an apartment in late August 1989. In the latter part of 1989, he underwent open heart surgery. Homer did not reside in the Residence in 1990.

In October 1989, Homer presented to his wife a draft complaint for divorce and a proposed settlement agreement that his law partner had prepared. She refused to agree to the proposed settlement agreement. Homer then retained Charles Hall as his divorce counsel and filed a complaint against Mrs. Homer in the Superior Court on October 30, 1989. She hired Linda Price as her divorce attorney. On the Closing and Disbursement Dates, Mrs. Homer had not filed an answer or counterclaim in the divorce case. The Superior Court had not entered any standing order or injunction concerning the Residence.

The divorce decree ending the marriage, entered by the Superior Court on May 30, 1990, incorporated a settlement agreement between the parties dated May 18, 1990. Paragraph eight of the settlement agreement provides for the sale of the Residence, with Helen Homer having the exclusive possession and use of the Residence in the interim. Homer agreed to make the mortgage payments and to indemnify Helen Homer from any default on the loan. The agreement further provided that the sale proceeds would first be used to pay off the first mortgage of approximately $120,000 (in fact, there were two security deeds against the property securing about $160,000 in debt) and all closing costs, including attorneys' fees and real estate commissions. Helen Homer was to receive the next $55,000 "for the current value of the lot which Wife purchased with funds from her inheritance." They agreed to use the balance of the funds to pay various debts and then to split any amount left over equally.

The settlement agreement did not specifically prohibit Homer from further encumbering the Residence, but it neither authorized the encumbrance of the Residence nor contemplated the possibility that Homer might have already obtained a new and different loan secured by the Residence. Mr. Homer concealed from Helen Homer, her attorney and the Superior Court the existence of the new loan from First Union. The proceeds of the loan from First Union were used to pay off the then existing first and second mortgages, but the Debtor did not disburse the balance of the loan according to the settlement agreement.

## C. *The Loan Application Process.*

Homer approached Ron Heider, Vice President of Production of Home Funding Corporation, in August 1989, regarding the possibility of refinancing the loans secured by the Residence. Homer completed portions of a personal information section of a residential loan application provided by Heider. Heider requested that information to obtain a credit report on Homer. In the application, which he sent back to Heider by telecopy, Homer accurately stated that he was married and was not a party to a law suit. Heider and Homer did not pursue the application in 1989 because of Homer's heart surgery.

In January 1990, Heider called Homer to find out if Homer wanted to continue the process of refinancing the Residence. He

met briefly with Homer in Homer's office on January 19, 1990. Heider arrived late to the meeting as Homer was packing his briefcase to leave his office. Homer gave Heider information regarding liabilities and the value of his law practice. Heider filled out a residential loan application from information provided by Homer in 1989 and at the meeting held on January 19, 1990. That hand written application, received in evidence as First Union Exhibit 5, was referred to at trial as the "scratch application." Before the meeting, Heider had filled in information required on the first page of the scratch application. Heider wrote on the scratch application that Homer's address was that of the Residence. He checked "no" to the question on the form as to whether the applicant was a party to a law suit. He checked the box indicating Homer was married, rather than separated. Finally, he checked a box saying the "undersigned" intended to occupy the premises as the primary residence of the applicant. Heider assumed that the information provided by Homer the year before was still correct. He could not recall whether he had asked Homer if he intended to own and occupy the Residence. He simply assumed that Homer so intended. Homer had no such intention on the Closing and Disbursement Dates.

Heider filled in the balance sheet on the second page of the scratch application with information supplied by Homer at the January 19 meeting. He was unable to compute the precise values of some assets, such as Homer's law practice. To figure out these values,. Heider asked Homer to state the prices at which he would be willing to sell assets. Homer gave a range of $200,000 to $300,000 for the law firm. Making no effort to distinguish between the value of the law firm and Homer's interest in it or to figure out whether any market existed for Homer's interest, Heider on his own initiative valued Homer's law practice at $300,000. This methodology was the standard one used by Heider to increase his clients' chances of getting loans. Using a similarly dubious methodology, Heider decided that Homer had earned $16,480 per month on average during the past two years. He wrote that number on the front page of the scratch

application in the section labeled "gross income," during his meeting with Homer. Heider's method of determining Homer's income, expenses and net worth was not designed to be accurate. It was designed to give his customer the best chance of getting a loan approved and thereby enhance his own chance to make a sizeable commission if the loan closed.

At the January meeting with Homer, Heider circled details about particular liabilities not provided by Homer and completed those sections of the scratch application later. Homer signed a blank copy of a residential loan application. His testimony and that of Heider differed as to whether Homer signed the scratch application after Heider had completed it. Homer testified that the reverse side of the application was blank when he signed it and that he did not look at the first page of the application. Heider testified both that Homer signed the application after he filled it in and that he was not sure when Homer signed it.

From notes made by Heider and the scratch application, Heider's office prepared a second, typewritten residential loan application marked as First Union Exhibit 6. Neither Heider nor First Union asked Homer for supporting documents or additional verification of income.

The loan that Heider proposed to Homer did not require income verification, but First Union's guidelines did require the borrower to occupy the property. Heider told Homer that it was a no-income verification loan. Homer's testimony that he did not understand that he was actually applying for a loan but was simply finding out whether he "qualified" for a loan is a mere exercise in semantics. Homer knew that Heider was a loan broker and that Heider intended to submit the application to a lender; he therefore knew he was applying for a loan, although he did not know that First Union was the lender until April 1990. Homer had no prior dealing with First Union.

Homer arranged with Heider at that meeting to have the Residence appraised and met with Heider and the appraiser at the Residence in early February 1990. The appraisal

showed the Residence to be worth $460,000. Never did Homer inform Heider that he was separated, that he was living in an apartment or that he was a party to a divorce action.

Heider subsequently submitted to First Union a loan application package that included the scratch application, the appraisal, a typed loan application and a credit report on Homer and his law firm. The credit report, received in evidence as Defendant's Exhibit 2, states it was "revised" on February 7, 1990. It showed Homer to be married and with an address at the Residence. The typed application differed in some respects from the scratch application because credit balances were adjusted to reflect information obtained from the credit report and from lenders.

First Union competed with other lenders to make residential loans in 1990. The competition was intense. To market loans to professionals and similarly situated self-employed individuals, First Union had devised its "EZ Doc" loan program as a fast and simple loan process. One of the hallmarks of the program was that First Union did not independently verify the income of a potential borrower through such traditional methods as requiring the customer to produce pay stubs or tax returns. First Union nonetheless adopted guidelines for this loan program that included a requirement that the borrower be able to repay the loan. To control its exposure on EZ Doc Loans, First Union decided that it would not lend more than 75% of a residential property's appraised value. Further, with an equity take-out, such as the loan made to Homer, the borrower had to reside in the house securing the loan.

From 1987 through May 1991, First Union employed Veronica Perry as an underwriter and a manager of underwriting of residential loans. She has worked in underwriting since at least 1978 and continues to work in the industry. She is familiar with the guidelines in the EZ Doc program. As a loan underwriter for First Union, Ms. Perry reviewed the loan documents for the Homer loan. She had the authority to approve or disapprove the loan application on behalf of First Union.

Ms. Perry reviewed the appraisal, the credit report on Homer and his law firm, the scratch application signed by Homer, and a typed loan application and the scratch application. She compared the typed application with the scratch application. Except for updates of amounts of liabilities, the applications were substantially the same. She approved the loan subject to certain closing requirements.

She, and therefore First Union, relied on the statements in the loan applications that Homer was married and was not a party to a law suit. Ms. Perry relied on the truthfulness of the present address stated in both the signed and unsigned applications. She also relied on the level of gross income stated in the applications to figure out that Homer could repay the loan because the loan "had to make sense." She also relied on the credit reports.

If she had known that Homer was separated she would have required a copy of the separation agreement to learn whether it created any contingent liabilities; without the separation agreement, she would not have approved the loan. If she had known that Homer was renting and living in an apartment she would have rejected the loan. Had she known of the divorce action, Ms. Perry would have requested a copy of the pleadings. She explained that obtaining such pleadings was part of the "normal documentation" of a loan to a customer who was a party to a divorce action.

Residential Funding Corp. ("RFC"), a buyer of residential loans in the secondary market, purchased the Homer loan from First Union. The sale of the loan was with recourse to First Union. Both RFC and First Union had to approve the loan and either of them could have rejected it. After the default, First Union repurchased the loan from RFC.

### D. *The Closing.*

On April 10, 1990, Homer went to the offices of Stephen Jenkins, the attorney for First Union and the agent for Commonwealth, to close the loan. Homer had learned of the closing only two days earlier. The practice of Jenkins and his partner consisted almost entirely of closing real estate

loans. Jenkins was personally closing approximately 100 loans per month in and around April 1990.

The actual closing of the loan to Homer took little time. Jenkins and Homer sat in a conference room in Jenkins' office where Jenkins had Homer sign various documents. Homer reviewed in detail and discussed with Jenkins the closing statement on Form HUD–1, received in evidence as Commonwealth Exhibit 2, including entries on the closing statement for title insurance. He also reviewed carefully the borrower's affidavit received in evidence as First Union Exhibit 9. Homer had a fair opportunity to read and review the remaining closing documents, including the completed typewritten residential loan application received in evidence as First Union Exhibit 6. He admitted that he initialed changes in the interest rate and the amount of monthly payments on First Union Exhibit 6. Nonetheless, Homer denied that he read it. He chose not to read the other closing documents, because he understood that they were "standard" loan documents, which First Union would not agree to change.

Jenkins testified that Homer signed First Union Exhibit 6 in his presence at the closing. Homer testified that he had signed First Union Exhibit 6 in blank when he met with Heider on January 19, 1990. Jenkins was unable to state when Heider signed First Union Exhibit 6, nor did he have any recollection about the dating of that document, which in fact was not dated at the closing.[1] Had Jenkins observed Homer signing First Union Exhibit 6, as he testified, he would have presumably observed Homer's failure to date that document. Giving no reason other than that he remembered Homer's personality, Jenkins said that he recalled this particular closing, out of some 5,000 that he has handled during the past few years.

The closing statement, received in evidence as Commonwealth Exhibit 2, accurately reflects that Vista Title Company issued a title binder at the closing. Jenkins' partner owned Vista Title Company and Jenkins was an authorized agent of Vista, which in turn was an authorized agent of Commonwealth. Commonwealth issued the title insurance policy pursuant to the binder that its agents, Vista and Jenkins, had issued at closing. That policy, naming First Union as the insured, showed that the security deed executed by Homer gave First Union a first priority security title and interest in the Residence.

As Commonwealth's agent and attorney, Jenkins is responsible for any errors made regarding the title search. Commonwealth has made a claim against his firm for issuing the policy without listing the Lis Pendens as an exception. Jenkins allowed a notary public to execute several closing documents after Homer had left his office, although the notary did not see Homer sign the documents or, in the case of the affidavit, take Homer's oath. The notary never witnessed Homer's signature. Without informing Homer, Jenkins charged Homer $200 for the title search, although he paid the title examiner only $45 for that search. These facts undermine the reliability of Jenkins' testimony.

Jenkins' testimony concerning the conduct of the closing lacked sufficient credibility to make a finding that Jenkins, as agent for either First Union or Commonwealth, relied on First Union Exhibit 6. The court further finds that Jenkins did not rely on the Acknowledgement of Receipt, received in evidence as First Union Exhibit 13, that Homer was residing in the Residence, or on Homer's statement in the Certificate of Confirmation, also a part of First Union Exhibit 13, that he did "ratify and confirm the transaction in all respects," except for the proposition that Homer did not want to cancel the transaction.

Notwithstanding the court's refusal to rely upon some of the testimony of Jenkins, the court finds that Jenkins truthfully testified that he would not have closed the loan to Homer or issued the title policy as agent for Commonwealth had he known of the existence of the Lis Pendens. In closing and disbursing the loan as First Union's Agent

---

1. Homer did not date First Union Exhibit 6 at the closing. Subsequent to the closing and to the microfilming of First Union Exhibit 6 by First Union, an unknown person dated that document April 10, 1990.

and in issuing the title binder and policy as Commonwealth's agent, he relied upon the statement in Homer's affidavit (First Union Exhibit 9) that there were no liens against the Residence.

### E. *Post-Closing Events.*

Charles Hall and Homer testified that they had no knowledge of the Lis Pendens in April 1990. In rebuttal, the Plaintiffs called Ms. Price, Helen Homer's attorney. Ms. Price identified a letter from her files dated April 15, 1991, from Hall to her, received in evidence as Commonwealth Exhibit 9, in which Hall stated: "I must admit that I was quite astonished when I saw that Certificate of Service, [purportedly certifying in 1991 that she had served him with a copy of the Lis Pendens in 1990] particularly when you admitted to Speros and me on April 12, 1990, when we were in your office, that you had failed to send me a copy of the Lis Pendens." On April 12, 1990, Linda Price informed Homer and Hall at a meeting in her office that she had filed a Lis Pendens against the Residence.

On April 16, 1990, Homer picked up a check from Jenkins for the net proceeds of the closing, but he did not inform Jenkins or First Union of the existence of the Lis Pendens. He intended to mislead First Union and Commonwealth regarding the existence of a lien against the Residence.

In 1988, 1989 and 1990, Homer had taxable income ranging from $30,000 to $35,000 per year. At the time the loan closed, Homer did not have sufficient income to make the monthly payments required by the Note. He had decided before obtaining the loan to use part of the loan proceeds to make the monthly payments. He invested a sizeable portion of the loan proceeds in common stock of a local public company. The company's stock subsequently declined in value and Homer lost his investment.

## II. *CONCLUSIONS OF LAW*

[redacted] The creditor seeking a determination of nondischargeability under 11 U.S.C. § 523 has the burden of proving the operative facts by a fair preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Further, the Eleventh Circuit has cautioned:

> Because of the very nature and philosophy of the Bankruptcy law the exceptions to dischargeability are to be construed strictly, *Gleason v. Thaw,* 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915), and the burden is on the creditor to prove the exception. *Danns v. Household Finance Corp.,* 558 F.2d 114 (2d Cir.1977).

*Schweig v. Hunter (In re Hunter),* 780 F.2d 1577, 1579 (11th Cir.1986).

First Union and Commonwealth bring these cases under 11 U.S.C. § 523(a)(2)(A) and (B). Those sections read in relevant part as follows:

> (a) A discharge under 727 ... of this title does not discharge an individual debtor from any debt—
>
> . . . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
>
> (ii) respecting the debtor's or an insider's financial condition;
>
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>
> (iv) that the debtor caused to be made or published with intent to deceive.

Commonwealth's complaint also includes a count under 11 U.S.C. § 523(a)(6), which excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

### A. *The Debtor's Knowledge of False Representations Concerning Personal Matters and the Lis Pendens.*

The Eleventh Circuit set out the elements of proof required under section 523(a)(2)(A) as follows:

To preclude the discharge of a particular debt because of a debtor's false representation, a creditor must prove that: the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation.... The debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality. *Schweig v. Hunter (In re Hunter)*, 780 F.2d 1577, 1579 (11th Cir.1986).

■ Section 523(a)(2)(A) deals with false representations not involving the financial condition of the debtor made to a creditor that induced the creditor to provide money, property, services or credit to the debtor. First Union and Commonwealth assert that the following statements made by the Debtor were false representations for purposes of section 523(a)(2)(A):

1. That his residence address was 4265 Gatewood Lane, Duluth, Georgia 30136 as stated in First Union Exhibit 6;

2. That he was married as stated in First Union Exhibit 6;

3. That he was not a party to a law suit as stated in First Union Exhibit 6;

4. That he intended to reside in the Residence as stated in First Union Exhibit 6; and

5. That there were "no claims of lien" against the Residence, as stated in the affidavit executed by Homer on April 10, 1990.

These representations were material. The requirements that a borrower occupy the premises securing the loan, provide truthful information about marital status and litigation and reveal any information he has about liens against the proposed collateral relate directly to the assessment of the degree of risk that First Union was undertaking.

The Debtor offers two defenses to the Plaintiffs' case under section 523(a)(2)(A). First, he contends that he did not read First Union's Exhibit 6 or the completed scratch application, had no understanding that he had executed a loan application and was unaware of the contents of either the scratch application or the typed application. The Debtor emphatically denied having had knowledge of the Lis Pendens at the time he received the loan proceeds.

Second, the Debtor contends that First Union had a duty to ferret out any liens against the property, to review the public record and to follow industry standards and its own internal procedures. The Debtor contends that the failure to conduct a title search properly and the failure to cross-check information provided by Homer with publicly available information rendered it impossible for either First Union or Commonwealth to have reasonably relied on any misstatement made by Debtor in the closing documents.

1. *Lack of Actual Knowledge of Misstatements.*

■ Homer's first contention that he was blissfully unaware of misstatements flounders on the general rule that "one who signs a written document without reading it, unless prevented from doing so by some fraud or artifice, is chargeable with knowledge of its contents." *Ricks v. U.S.*, 434 F.Supp. 1262, 1270 (S.D.Ga.1976). That is the general rule in Georgia. In Georgia, if a party signs a writing with blanks left to be filled in by the other party, the person signing "in blank" is bound by the document. *Butts v. Atlanta Federal Savings & Loan Association*, 152 Ga.App. 40, 262 S.E.2d 230 (1979). Moreover, Homer's professed lack of actual knowledge of the contents of the loan application do not provide him with a shield from a fraud claim if he intended to mislead First Union or acted recklessly in failing to read the application.

■ Homer did not negligently or inadvertently fail to read the loan application; he *deliberately* did not read it. Homer knew that his financial and personal circumstances made it problematical that anyone would refinance the loan on the Residence. He revealed that uncertainty by his insistence that he sought only to learn whether he could

qualify for a loan. Knowing that qualification was uncertain because of his circumstances, Homer faced a dilemma in reviewing the loan application. If he reviewed it and it contained incorrect information, he presumably knew as a bankruptcy practitioner that he would have no defense to a fraud claim. On the other hand, if the application correctly stated that he was separated and was not living in the Residence, he would not have misled the lender. To avoid making an overt and positive misrepresentation, Homer opted not to read the application and thereby could deny knowledge of any misrepresentation.

Homer's testimony that he did not know he was applying for a loan but thought he was merely learning whether he qualified for a loan is simply not believable. Homer was engaged in an unfriendly, if not bitter, divorce. His wife had insisted on receiving, and he finally agreed that she should receive, $55,000 from the process of the sale of the Residence. He knew that in time he could not avoid paying his wife a sizeable portion of the equity in the Residence. He was angry with his wife. He knew his net income was insufficient to make the monthly payments due on the Note. Under the circumstances in which he found himself—insufficient income to repay the loan, a party to a divorce case, not living in the house he was trying to refinance, and sophisticated enough in loan transactions to recognize the Bank might fail to learn of possible misstatements on the application—Homer intentionally tried to remain ignorant of the documentation prior to the Disbursement Date. In doing so he showed a thoroughly reckless disregard for the truth.

 Reckless disregard for the truth can supply the necessary scienter under the proper circumstances to support a determination of nondischargeability. In *Birmingham Trust Nat. Bank. v. Case*, 755 F.2d 1474, 1476 (11th Cir.1985), the court held that "reckless disregard for the truth or falsity of a statement constitutes a 'false representation' under § 523(a)(2)(A) of the Bankruptcy Code." To choose to remain ignorant of one's representations in a document upon which another is likely to rely is to choose to deceive, if the document contains materially

false representations. Homer acted so recklessly in failing to read the loan application that his conduct is the equivalent of an intent to defraud First Union.

Homer's testimony that he was not aware of the existence of the Lis Pendens at the time he received the loan proceeds was not true. He learned of the Lis Pendens on April 12, 1990, several days before he obtained the loan proceeds. He had carefully read the affidavit he signed at closing stating that there was no such lien. Although his signature was not properly notarized, he knew that a closing attorney and agent for a title insurance company would rely on the affidavit. The closing attorney and agent for First Union and for Commonwealth relied on the affidavit and on Homer's omission to tell him that he had subsequently learned about the Lis Pendens. He intended for First Union and Commonwealth to rely on the affidavit in disbursing the loan proceeds; otherwise, he would have disclosed what he knew. He intended to mislead First Union and Commonwealth, and his denial of that fact is not credible.

### 2. Reasonableness of Plaintiffs' Reliance on Non–Financial Information.

First Union was not aware on the Closing and Disbursement Dates that Homer was separated from his wife, was a party to a divorce action and was not living in the Residence. The underwriter and therefore First Union relied on the misstatements concerning those facts in the scratch and typed loan applications. Although the non-financial data such as residence address or marital status relate ultimately to the borrower's financial condition, such facts were not merely financial representations. If that were their only significance, First Union's reliance on those representations would not have been reasonable because of its failure to exercise prudent business practices in evaluating the potential borrower's *net* income. See Part II.B., *infra.*

 The non-financial representations alone do not establish an ability or an inability to repay a loan. Rather, First Union used that information as threshold criteria for a borrower's eligibility for an EZ Doc loan (as opposed to some other type of loan that First

Union may or may not have been willing to make). To that extent, the non-financial conditions were important to First Union in determining whether it would underwrite the loan according to the guidelines and procedures established for the EZ Doc program. The Defendant elicited no testimony from First Union witnesses that it would not have verified income regardless of what it knew about the Defendant's marital status. Veronica Perry, the First Union underwriter, said that she would not have approved the loan had she known that the Debtor was not residing in the Residence and would have required additional information had she known that the Debtor was in a divorce case. Thus, the non-financial representations were material and led directly to the making of the EZ Doc loan and therefore to the loss suffered by First Union. First Union's closing attorney, who was also Commonwealth's agent, did not rely on those misstatements.

The Debtor contends that First Union's reliance on information concerning his personal life was not reasonable because the misstated facts were readily available to it through inspection of public records. Specifically, the Debtor faults First Union for its failure to review the plaintiff index of law suits in the Superior Court. That index presumably reflected the commencement of the Debtor's divorce action in 1989.

Preliminarily, it should be noted that the Debtor made no showing that First Union failed to follow its own normal business practices with respect to obtaining personal information about the Debtor. He failed to show that First Union normally searched the plaintiff index concerning approval of residential loans. The Debtor also failed to introduce any evidence to show that the steps taken by First Union in processing and evaluating the loan application were not in conformity with industry standards.

■ There are indeed a number of reported cases that state the general rule, in language similar to that used by the Sixth Circuit in *Manufacturer's Hanover Trust Co. v. Ward (In re Ward)*, 857 F.2d 1082, 1084 (6th Cir.1988), that "a lender must investigate creditworthiness and ferret out ordinary credit information." In determining the outer limits of a lender's duty, it is essential to read the cases in the factual contexts presented and not simply to assume that such broad language means that a creditor's duty extends to discovering all available public information, no matter the circumstances of the particular case. For example, Homer points in his Proposed Findings of Fact and Conclusions of Law to the proposition that a lender "cannot assume the position of an ostrich with its head in the sand and ignore facts which were available to it." *In re DuCote*, 4 B.C.D. 943, 945 (Bankr.W.D.La. 1979). That is exactly what the lender did in *Ward*. There, the lender naively relied on a promise in the loan application that the debtor would repay the debt and issued a credit card without any credit check. The language from the *DuCote* case was quoted in *Belcher Oil Co. v. Price (In re Price)*, 48 B.R. 211 (Bankr.S.D.Fla.1985) (not *Helm v. Helm (In re Helm)*, 48 B.R. 215 (Bankr.W.D.Ky.1985) as stated by the Debtor). The creditor in *Price*, having conducted no investigation of the debtor's credit, unreasonably relied on a financial statement that was not current and had been prepared for a different lender. Similarly, in *DuCote* the creditor conducted no investigation of the debtor's financial situation. The facts here differ from these cases in several respects.

■ Even if it had been First Union's practice to search the plaintiff index of law suits, its reliance on the Debtor's representations that he was married, was residing in the Residence and was not a party to a lawsuit was reasonable. First, there were no "red flags" that would have put First Union on notice that Homer was making misrepresentations to the First Union.

■ Second, First Union did not rely solely on the Debtor's representations. It conducted an independent investigation of the information provided by the Debtor. The title search did not include a review of the plaintiff index of law suits in Gwinnett County. But, that omission was not unreasonable because the plaintiff index would not routinely reveal the existence of possible liens against real property. The search that was conducted included a review of the real

estate records and the defendant index in Gwinnett County, which normally would reveal such liens. Although the title searcher missed the Lis Pendens, nothing else in the search gave First Union any reason to suspect that the loan application contained false information.

First Union also obtained a credit report, received in evidence as Defendant's Exhibit 2, in the conduct of its investigation. The credit report showed Homer to be married and residing at the Residence. Nothing in the credit report raised a red flag.

Third, the First Union's loan broker, Heider, conducted an on-site inspection of the Residence with an appraiser. The Debtor made a point of being present at the inspection by the appraiser, thereby giving Heider no reason to suspect that Homer was separated.

■■■ The standard of care to which a lender is held in reviewing credit and title information is not one of perfection. Creditors do not have to conduct an exhaustive review of a borrower's representations, merely a commercially reasonable one, where the loan application shows no irregularity on its face. *Compare American General Finance, Inc. v. Steinbrunner (In re Steinbrunner)*, 149 B.R. 484 (Bankr.N.D.Ohio 1992); and *G.V. Moore Lumber Co., Inc. v. Day (In re Day)*, 54 B.R. 570 (Bankr.D.Mass. 1985) (both cases proceeded under § 523(a)(2)(B), but are instructive in (a)(2)(A) cases on the issue of reasonable reliance).

■■■ The Debtor also contends that it was unreasonable for First Union or Commonwealth to have relied on any representation or omission that he made regarding title. In support of his position, he cites *U.S. Life Title Ins. Co., v. Kisich (In re Kisich)*, 28 B.R. 401 (9th Cir. BAP 1983). In *Kisich*, the IRS had recorded a lien against a residence owned by the debtor, and the title company failed to uncover the lien during a title search immediately prior to the sale of the house. There was a dispute about whether the debtor disclosed the lien. The court held that "it is patently unreasonable for the appellant (title insurer) to have relied on the debtors' representations since the very essence of a title insurer's function is to ascertain the state of title to property." 28 B.R. at 403. This court disagrees with this broad statement made by the Panel in *Kisich* to the extent it might be read to imply that lenders and title insurers are always charged with knowledge of the public record.

The facts of *Kisich* differ materially from the facts here. In *Kisich*, the insurer did not prove that the debtor deliberately concealed the IRS lien or that she knew that the insurer was unaware of the lien; to the contrary, the debtor's sworn statement that she revealed the possible existence of the lien was uncontroverted. In this case, the Debtor knew beyond any doubt that the title search had missed the Lis Pendens, while only a few days earlier, he had read the one closing document in which he made a contrary representation. Nonetheless, he accepted a check for over $155,000 and concealed the title defect. He did so precisely because he knew he could not get the loan if he revealed that fact to First Union and Commonwealth. Homer's conduct is made no less egregious when considered in light of his reckless failure to read the loan application, which led First Union to believe he was married and not separated.

First Union witnesses did agree that it was not reasonable to close such a loan if First Union's security deed did not have a first priority. That testimony must be considered in the context of the facts of the case, however. The issue is not whether First Union acted unreasonably in closing the loan with a prior lien on record that it could have discovered. Rather, the question is: did First Union reasonably rely on the Debtor's representation that there was no such lien, when he knew that it had failed to discover the lien?

■■■ A borrower has an independent duty to reveal the existence of a title defect when he learns of it if he knows that the lender or title insurer is relying on incorrect information, irrespective of any duty imposed on the lender or insurer to discover that defect. *See Trizna & Lepri v. Malcolm (In re Malcolm)*, 145 B.R. 259 (Bankr.N.D.Ill.1992); *Ticor Title Ins. Co. v. Reitz (Matter of Reitz)*, 134 B.R. 131 (Bankr.D.Del.1991). Homer's

duty to disclose arose not only from the fact that he knew the title insurer and First Union were acting without knowledge of the Lis Pendens, but also from the fact that he affirmatively represented in his affidavit that no such lien existed.

■ Finally, the determination by the Superior Court that First Union had notice of the lien is not res judicata on the issue of whether First Union had actual knowledge of the Lis Pendens. The Superior Court was merely stating the obvious principle that the public record provides constructive notice to competing lien claimants. Constructive notice does not bar First Union from denying actual notice or provide Homer with a defense.

> A plaintiff must show that "he was justified in his reliance," but negligence in failing to discover an intentional misrepresentation is no defense ... Moreover, "[t]he fact that an investigation would have revealed the falsity of the misrepresentation will not alone bar his recovery, and it is well established that he is not held to constructive notice of a public record which would reveal the true facts."

*Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1459 (9th Cir.1992), *quoting* Justice Roger Traynor in *Seeger v. Odell*, 18 Cal.2d 409, 414–15, 115 P.2d 977 (1941).

■ Commonwealth stands in the shoes of First Union with respect to false representations made by the Debtor to First Union on First Union Exhibit 6. See Order of February 2, 1994, denying Debtor's Motion For Partial Summary Judgment. It has an independent claim arising from Homer's false representation that he was unaware of any lien against the Residence.

The damages discussed below suffered by Commonwealth and the debt due to First Union resulted directly from the false representations made by the Debtor on which the Plaintiffs reasonably relied. First Union would not have made the loan to Homer had it known of false representations made by Homer concerning his marital status, residence address and involvement in divorce litigation or had it known of the Lis Pendens.

Commonwealth would not have issued the title insurance policy had it known of the Lis Pendens. These debts are therefore nondischargeable.

**B. Misstatements of Financial Condition and Plaintiffs' Reliance.**

First Union and Commonwealth contend that the Debtor made false representations in writing concerning his financial condition upon which First Union reasonably relied within the meaning of section 523(a)(2)(B). In particular, Plaintiffs assert that Homer overstated his income, failed to disclose certain liabilities, including the liability for his apartment rent and child support, and overstated the value of his business.

■ Regarding the value of the business, First Union's underwriter, Veronica Perry, said that she did not rely upon that representation in making the loan. Because the Plaintiffs' elicited testimony from Homer that his net taxable income in 1988, 1989 and 1990 was less than $35,000 per year, they contend that he misrepresented his income on First Union Exhibit 6 by stating that his gross income averaged over $15,000 per month. Assuming without deciding that the Debtor's statement of gross income was incorrect, First Union failed to prove reasonable reliance on that figure. First, it failed to distinguish, on the application and at trial, net income from gross income. The application asked only for gross income and for some, but not all, expenses. It made no inquiry into how much *net* income would be available to service the mortgage.

Second, First Union is charged with knowledge that Home Funding Corporation manufactured the gross income figure. Home Funding provided a service to First Union by assisting customers in the completion of loan applications, a task that First Union would otherwise have had to do itself. To that extent Home Funding was First Union's agent. Preparing such an application is not entirely clerical. Difficult questions of valuation can arise, leaving the preparer in the position of choosing among various possibilities. It was therefore commercially unreasonable for First Union to have relied upon a loan application containing fi-

nancial information manufactured by its agent using nonsensical methodologies, as if its agent had merely acted as a scrivener. First Union exercised no control over the methodologies used by Home Funding in determining gross income.

In summary, First Union simply could not figure out from the information provided to it on First Union Exhibit 6 whether Homer could make loan payments. Instead, First Union assumed that the gross income stated was sufficient for that purpose. It relied, not upon a representation of Homer, but upon its own assumption that Homer's net income would be sufficient without any adequate inquiry into what his business and personal expenses were.

■ Regarding the omission of the monthly liability for rent and for voluntary payments made by Homer to his wife for child support, First Union could not reasonably rely upon those omissions for financial purposes because First Union failed to take sufficient steps to analyze the total income and expense picture to justify reliance on any net income figure. Thus, both First Union and Commonwealth have failed to prove facts sufficient to support a prima facie case under § 523(a)(2)(B) of the Bankruptcy Code.

### C. *Willful and Malicious Injury.*

■ Commonwealth also asserts a claim under 11 U.S.C. § 523(a)(6). At the conclusion of the Plaintiff's case, Defendant Homer moved for judgment. The court denied that motion with respect to § 523(a)(2) but granted it with respect to § 523(a)(6). The court pointed out that no credible evidence had been submitted showing that the Debtor knew that his conduct would result in a loss to First Union. In particular, the court pointed out that there had been no evidence showing that Homer knew there would be a default.

During the course of the cross-examination of Homer on the Defendant's case, Homer admitted that he intended to use portions of the loan proceeds to make mortgage payments. After that testimony, Commonwealth requested the Court to reconsider its ruling regarding Commonwealth's under subsection (a)(6).

The court declines to change its ruling. Commonwealth failed to prove the elements of subsection (a)(6) on its case in chief. The court dismissed that count for all purposes.

■ "Malice for purposes of § 523(a)(6) can be established by a finding of implied or constructed malice." *Chrysler Credit Corporation v. Rebhan,* 842 F.2d 1257, 1262 (11th Cir.1988). Thus, a Plaintiff need not show actual ill will but must show "an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another." *Ikner v. Ikner (In re Ikner),* 883 F.2d 986, 991 (11th Cir.1989). An action is malicious if it is wrongful and without just cause. *Ikner,* 883 F.2d at 991. Thus, in this case, proof of willful and malicious conduct on the part of the Debtor would entail a showing that the Debtor intentionally acted to defraud Commonwealth. As to the matters discussed in part II.A. above, the court has determined that the conduct of Homer was in reckless disregard of the truth and not willful fraud, except as to the failure to disclose the Lis Pendens. Moreover, Homer may well have believed that he would ultimately have been able to make the loan payments. In any case, the evidence offered by Commonwealth during its case in chief did not establish the contrary. Because the facts presented did not support a judgment for Homer under subsection 523(a)(2)(A) at the close of plaintiffs' case with regard to all contentions Plaintiffs were making, the case under that count remained open for additional evidence, even though at that time, Plaintiffs had not shown that Homer had intentionally failed to disclose the existence of the Lis Pendens. Thus, Commonwealth has shown no basis for giving it a second bite of the apple.

### D. *Damages.*

■ The damages suffered by First Union as a direct result of the false representations of the Debtor total $166,257.34 as of the date of this decision. The damages consist of the principal balance due on the Note of $131,678.27 and interest of $34,579.07 from February 5, 1992.

The damages suffered by Commonwealth as a result of the false representations of the Debtor total $110,195.43 as of the date of this decision. That amount is the sum of $70,000 paid to Mrs. Helen Homer on November 27, 1991, plus interest on that amount at the contract rate of 11.25% from November 28, 1991, to the date of this decision totaling $19,870.89, plus the attorneys' fees incurred by Commonwealth in the state court litigation in the amount of $20,324.54.

The court will enter appropriate judgments in favor of each of First Union and Commonwealth against Homer and these judgments shall be nondischargeable.

IT IS SO ORDERED.