**IT IS ORDERED** that the Motion be and is hereby **GRANTED**.

The Clerk of Court shall serve a copy of this Order upon the Plaintiffs' counsel, the Defendant's counsel, and the Trustee.

**In the matter of Richard L. BRANDON, Debtor.**

**SunTrust Bank, Plaintiff,**

**v.**

**Richard L. Brandon, Defendant.**

**Bankruptcy No. 01–20745.
Adversary No. 01–2056.**

United States Bankruptcy Court,
S.D. Georgia,
Brunswick Division.

Nov. 18, 2002.

James D. Benefield, Brunswick, GA, for Plaintiff.

John S. Myers, St. Marys, GA, for Defendant.

### MEMORANDUM AND ORDER ON MOTION TO DETERMINE DIS-CHARGEABILITY OF DEBT

LAMAR W. DAVIS, JR., Bankruptcy Judge.

Richard L. Brandon ("Debtor") filed for Chapter 7 bankruptcy protection on May 17, 2001, and listed SunTrust Bank ("Sun-Trust") as a creditor. SunTrust timely filed a proof of claim for a debt in the principal amount of $210,029.23, plus attorney's fees and interest. SunTrust objects to discharge of that debt under 11 U.S.C. § 727 and seeks a determination that the debt is non-dischargeable under 11 U.S.C. § 523. The Court has jurisdiction in this core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Having considered evidence presented in the pleadings and at trial on August 8, 2002, arguments of counsel, and available authority, I make the following Findings of Fact and Conclusions of Law in conformance with Federal Rule of Bankruptcy Procedure 7052(a).

### FINDINGS OF FACT

Debtor is a physician practicing in the Camden County, Georgia, area. He previously specialized in obstetrics and gynecology. At present, however, he specializes only in gynecology. Since 1996, Debtor has successively conducted his medical practice through three corporate entities: Brandon Women's Center, Camden Women's Center, and Camden Healthcare Association.

Debtor first established his business as Brandon Women's Center ("BWC"). On July 8, 1996, while conducting his medical practice through BWC, he individually borrowed $410,115.00 from SunTrust, Ex. P–1. He agreed to "promptly notify Secured Party [SunTrust], in writing, of any addition to, change in, or discontinuance of its place of business as shown in this instrument and the location of its office where it keeps its records as set forth herein." Ex. P–8, ¶ 4.a. With BWC's consent, see Ex. P–2 (captioned "Owners Consent to Pledge Collateral"), Debtor pledged BWC's accounts receivable, including "receivables now or hereafter received," as collateral. See Exs. P–1, P–2, P–4 (Exhibit A, "Accounts Receivable," attached to UCC–1). The security agreement itself was execut-

ed by Debtor in his individual capacity only. *See* Ex. P–8. On July 9, 1996, Sun-Trust perfected its security interest in BWC's receivables by filing a UCC–1 Financing Statement. Ex. P–4. On March 18, 1999, the SunTrust debt was renewed in the principal amount of $234,080.49, and on April 4, 2000, the debt was renewed in the amount of $203,266.30. Exs. P–3, P–5 (each stating purpose as "renewal/consolidate debt & pay off IRS"; each indicating that "this Note is a renewal, but not a satisfaction, of Loan Number 0883955846–18"). The renewal notes, each of which was signed by Debtor individually, recited that "the obligations under this Note are also secured by the collateral described in any security instruments executed in connection with this Note, and any collateral described in any other security instruments securing this Note or all of Borrower's obligations to Lender." Exs. P–3, P–5.

Early in 1998, prior to executing the 1999 and 2000 renewals of the SunTrust debt and without giving notice to Sun-Trust, Debtor established and began to conduct his medical practice through a new entity, Camden's Women Center ("CWC") and ceased doing business through BWC.[1] On August 14, 1998, Debtor pledged CWC's accounts receivable and other assets to the First National Bank of Kingsland, Georgia, Ex. P–11, for the purpose of securing a line of credit which CWC needed to fund its business operations, *see* Ex. P–12. Debtor acknowledges that CWC utilized the same telephone number, employees, and office location that BWC had used.

Debtor currently practices as an independent contractor providing services to Camden Healthcare Association ("CHA"). The owner of CHA is Sally Bennett. On July 17, 2000, Debtor and CHA executed a provider agreement under which CHA allowed Debtor to provide medical services through CHA, effective June 1, 2000. Ex. P–7. Under that agreement, CHA was to retain the first $6,000.00 of all monies received, Debtor was to receive the second $6,000.00 of receipts for services rendered, and any excess was to be shared, with Debtor receiving 60 percent. Debtor testified that the provider agreement was subsequently modified, and that he now receives 90 percent of the excess over $12,000.00 per month.

On July 14, 2000, Debtor, while retaining the corporate form of CWC, attempted to convey the assets of CWC to Bennett and CHA. *See* Ex. P–6. That transaction resulted in a net disbursement to Debtor of approximately $98,000.00.[2] The real estate and equipment conveyed were sold by Debtor individually and not by CWC. After the closing, approximately $30,000.00 in CWC receivables were paid to CHA.[3] Although the documents do not reflect that the accounts receivable were sold, the parties do not appear to dispute that this was their intent. Debtor also pledged other CWC assets to CHA, including "all inventory, furniture, fixtures, equipment, raw materials and products, as well as manufactured products, all account receivables, note, chattel papers, purchase orders, con-

---

1. Debtor testified that he changed the name of his professional corporation from BWC to CWC in anticipation of taking on a partner in the practice. That partnership never materialized.

2. The contract price was $319,821.18. Ex. P–6. Bennett assumed an existing note to First National Bank in the amount of $219,821.18.

*See* Exs. P–6; P–11; P–12. After appropriate taxes and fees were deducted, Debtor received $98,032.12 cash at closing. Ex. P–6.

3. For three separate two-week periods in the year 2000, $30,784.00 payable to CWC or to Debtor were deposited to CHA's account.

tracts, general and intangible property and all rights of payment and all money received now and hereafter for Camden Womens Center." P–11.

Debtor's bankruptcy petition listed his gross income at $5,200.00 per month, while the productivity reports from September of 2000 to May of 2001 showed that his income averaged more than $8,000.00 monthly. Ex. P–15. Debtor's explanation for the apparent discrepancy is that CHA pays $8,000.00 to CWC pursuant to a provider agreement between CWC and CHA. From that amount, CWC pays, in addition to Debtor's salary, certain overhead expenses including liability insurance coverage, professional dues, and lease payments on a piece of ultrasound equipment owned by CWC.

SunTrust vice president and loan officer Ronald Adams testified that at the time he "rolled over" the original loan-when the balance was in the $200,000.00 range-Debtor provided no information concerning any change in his corporate structure or in billing practices. Mr. Adams learned of the changes only after Bank sued, obtained a judgment, sent letters to persons who owed money to Debtor's original professional corporation, and was informed by the payers that they showed no payables to BWC due to the Debtor's changed billing practices.

Mr. Adams personally examined microfilm records of First National Bank of Kingsland ("Kingsland"), where Debtor began doing business after he formed CWC. From those records, Adams notes that beginning in 1998, payments to BWC were deposited into the CWC account. Because he found Kingsland's microfilm records to be disorganized, he was unable to determine exactly what funds that may have been intended for BWC were deposited to the CWC account. To have done so would have required him to look at every item included in every deposit on every day's activity at Kingsland. Within the available discovery time, he determined that between January and April of 1998, $17,010.99 in checks payable to BWC were deposited to the CWC account. *See* Ex. P–16.

*Positions of the Parties*

SunTrust asserts the following bases for excluding the debt from discharge: (1) § 523(a)(4) applies because Debtor, as the controlling principal of BWC, failed to marshal all accounts receivable for the benefit of BWC creditors as required under this Court's decision in *Smith Drug Co. v. Pharr–Luke* (*In re Pharr–Luke*), 259 B.R. 426 (Bankr.S.D.Ga.2000); (2) § 523(a)(6) applies because Debtor intentionally damaged its interest in BWC's accounts receivable; and (3) § 523(a)(2) applies because Debtor fraudulently failed to disclose corporate changes to SunTrust when he requested renewals of the original loan.

Debtor admits that at the time he signed the renewal notes, he did not advise SunTrust of the change in his corporate structure from BWC to CWC nor or that he was billing his medical services in a name other than BWC. He also admits that he did not advise Sun Trust that he had sold the assets of CWC to Sally Bennett or inform Sun Trust that he had executed a provider agreement with CHA. Debtor contends, nonetheless, that he did not violate any provision of the agreements or of Georgia law in failing to disclose these facts, and that Georgia case law shows that it was SunTrust's duty to monitor its collateral and to make inquiries. He also argues that the Court should not speculate as to any commingling of assets of BWC with CWC's assets other than the $17,000.00 testified to by Mr. Adams, that accounts receivable are temporal in nature and thus ever-changing in amount and col-

lectability, and that SunTrust cannot in this Court rely on the value of the receivables as matching the unpaid balance of his obligation because of their fungible and rolling nature.

## CONCLUSIONS OF LAW

For the reasons that follow, the debt will be excluded from discharge by application of 11 U.S.C. § 523(a)(2).

■■■ Section 523(a)(2) provides that a discharge "does not discharge an individual debtor from any debt . . . for . . . renewal or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." § 523(a)(2). "As distinguished from false representation, which is an express misrepresentation[,] false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression," *Minority Equity Capital Corp. v. Weinstein* (*In re Weinstein*), 31 B.R. 804, 809 (Bankr. E.D.N.Y.1983), and "[i]t is well recognized that silence, or the concealment of a material fact, can be the basis of a false impression which creates a misrepresentation actionable under § 523(a)(2)(A)," *id.; see also, e.g., Citizens & S. Nat'l Bank v. Thomas* (*In re Thomas*), 12 B.R. 765, 768 (Bankr.N.D.Ga.1981) ("A debtor's silence may amount to a materially false representation prohibiting discharge of the indebtedness."). Actual fraud requires showings that the defendant made a false or misleading representation with the intent to induce reliance and that the plaintiff detri-

mentally relied on the representation. *See, e.g.,* O.C.G.A. § 51–6–2(a) ("Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action."); *Smith v. McClung,* 215 Ga.App. 786, 787, 452 S.E.2d 229, 230 (1994).

■■ In this case, Debtor pledged BWC's present and future accounts receivable to SunTrust as collateral for the loan. Debtor was under no duty to continue to operate BWC for SunTrust's benefit, and the fact of the accounts-receivable pledge in no way prevented Debtor from making corporate changes at will, including liquidating BWC's assets and establishing CWC using those assets.[4]

Upon requesting SunTrust to renew the note and agreeing to the renewal terms, however, Debtor was under a duty to disclose the corporate changes. On each of the two renewal occasions, the renewal note recited that "the obligations under this Note are also secured by the collateral described in any security instruments executed in connection with this Note, *and any collateral described in any other security instruments securing this Note or all of Borrower's obligations to Lender.*" Exs. P–3 & P–5 (emphasis added). This language clearly implies that the BWC collateral previously pledged remained efficacious. On each occasion, Debtor signed the renewal note without informing SunTrust that BWC's "accounts receivable" were non-existent. Debtor's silence

---

**4.** Debtor's sole express contractual duty was to "promptly notify Secured Party [SunTrust], in writing, of any addition to, change in, or discontinuance of its place of business as shown in this instrument and the location of its office where it keeps its records as set forth herein." Ex. P–8, ¶ 4.a. Although the note identified several events that would trigger default, those events did not include changing the corporate structure. *See* P–1.

The note provided that "any other act or circumstance leading the holder to deem itself insecure," would have allowed SunTrust either to declare the note "due and payable, without notice." *Id.* Thus, had SunTrust become aware that Debtor was no longer billing his medical services as BWC, it could have demanded immediate payment and required any remaining "accounts receivable" to be paid directly to SunTrust.

created the false impression that BWC's accounts receivable remained viable collateral for the loan. That false impression is sufficient for nondischargeability, provided that (1) Debtor intended to create the false impression and (2) SunTrust relied on the false impression to its detriment. For the reasons that follow, I conclude that both the intent and the reliance elements have been satisfied.

### (1) Debtor intended to create a false impression.

■■■ The proper focus for determining Debtor's intent is whether he intended to use false pretenses or a false representation for the purpose of obtaining the loan renewals.[5] *See* O.C.G.A. § 51–6–2(a) (requiring *"willful* misrepresentation" that was *"made to induce* another to act" (emphases added)). "Mere concealment of a material fact" is not sufficient to prove intent; rather, that concealment must have been made "in such a manner as to deceive and mislead." *Id.* "Suppression of a material fact which a party is under an obligation to communicate," evidences intent to mislead. *See id.* § 23–2–53. Such an obligation may arise from "the particular circumstances of the case." *Id.*

A factual example of suppression of a material fact arising from "the particular circumstances of the case" is found in *Wheeling Wholesale Grocery Co. v. Piccolomini (In re Piccolomini)*, 87 B.R. 385 (Bankr.W.D.Pa.1988), in which case a debt for goods received by the debtor was held non-dischargeable under subsection (a)(2)(A), *id.* at 388. The debtor in that case, having agreed to COD-only delivery terms and having paid as agreed on prior

occasions, delivered post-dated checks, in sealed envelopes, to delivery drivers as payment for goods received but failed to disclose that the checks were post-dated. *Id.* at 386–87. The court found the debtor's nondisclosure of the fact of post-dating to have constituted knowingly false representations for purposes of inducing delivery of the goods. *Id.* at 388.

■■■ The circumstances in the present case similarly give rise to "an obligation to communicate" to SunTrust at the time Debtor renewed the note that BWC no longer had any accounts receivable. Although "fraud cannot be predicated upon statements that are promissory in their nature as to future acts," *McClung,* 215 Ga.App. at 788, 452 S.E.2d 229, fraud may be predicated on promissory statements if, "when the representation is made, the promisor *knows* that the future event will not take place," *id.* (emphasis added). At the time he obtained the original loan, Debtor evidenced no fraudulent intent in estimating the amount of expected receipts then ripe for collection; such representations merely constituted an expression of future expectation. When he signed the renewal notes, however, he *knew* that no future "BWC" receipts would be generated. He also *knew* that the receipts he was then currently generating had been pledged to another bank as security. Furthermore, when combined with his failure to disclose to SunTrust changes in his corporate form, his actions in depositing BWC's receipts into CWC's account evidences, at minimum, that he *knew* that SunTrust's security interest in his business's receivables was merely an illusion. His silence in the face of his knowledge

---

**5.** Debtor contends that at no time did he renew the loan while intending not to repay the debt. It appears that this is so, in that Debtor continued to make payments for a time in conformance with the terms of the renewal agreements. The intent of Debtor with respect to repaying the loan, however, is not the relevant issue in the context of this § 523(a)(2) determination.

constituted a knowing misrepresentation that the receivables for his medical services were still available to SunTrust as security for the renewed note.

I conclude, therefore, that Debtor intended to induce SunTrust to renew the promissory note by means of fraud or false pretenses.

*(2) SunTrust detrimentally and justifiably relied on the false impression.*

 The final inquiry is whether Sun-Trust in fact relied on Debtor having propagated the false impression and, if so, whether that reliance was justified. *See Field v. Mans,* 516 U.S. 59, 72–75, 116 S.Ct. 437, 445–46, 133 L.Ed.2d 351 (1995) (relying on common-law understanding of "reliance" in examining actual fraud and holding that "§ 523(a)(2)(A) requires justifiable, but not reasonable, reliance"). "[W]here an individual knows ... that another is acting without knowledge of material facts, the reliance element is satisfied by objective proof, [that is], whether a reasonable person might have considered the facts important to his or her decision. Conversely, it is not a defense that the plaintiff's lack of knowledge was based on [its] own negligence in ascertaining the truth." *Rainier Title Co. v. Demarest (In re Demarest),* 176 B.R. 917, 922 (Bankr. W.D.Wash.1995); *see also Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh),* 973 F.2d 1454, 1459 (9th Cir.1992) ("A plaintiff must show that he was justified in his reliance, but negligence in failing to discover an intentional misrepresentation is no defense." (internal punctuation omitted)); *Commonwealth Land Title Ins. Co. v. Homer (In re Homer),* 168 B.R. 790, 803 (Bankr.N.D.Ga. 1994) ("A borrower has an independent duty to reveal the existence of a title defect when he learns of it if he knows that the lender or title insurer is relying on

incorrect information, irrespective of any duty imposed on the lender or insurer to discover that defect.").

 Reliance is not justified where there is no duty to disclose material facts and where both parties have equal access to undisclosed information. *Longino v. Bank of Ellijay,* 228 Ga.App. 37, 39–40, 491 S.E.2d 81, 84–85 (1997); *see also Roth v. Connor,* 235 Ga.App. 866, 871, 510 S.E.2d 550, 556 (1998). On the other hand, "[j]ustifiable reliance imposes no duty to investigate unless there is obvious reason for inquiry." *Branton v. Hooks (In re Hooks),* 238 B.R. 880, 885 (Bankr.S.D.Ga. 1999).

 At the time SunTrust renewed the note, Debtor's silence led Sun Trust to believe that it was in the same secured position it was in at the time Debtor executed the original note—that, should it call the note, it was in a position to directly collect the accounts receivable generated by Debtor's medical practice. Debtor and Sun Trust had ongoing business dealings and a familiar relationship. CWC was located at BWC's old address. CWC had the same phone number and many of the same patients. Debtor continued to be the sole medical doctor practicing out of that address. Only after SunTrust called the note and informed Debtor's payers to remit directly to SunTrust rather than to BWC did Sun Trust become aware that BWC no longer existed and that there were no accounts receivable to collect.

Debtor asserts that SunTrust was comfortable taking the risk that BWC's accounts receivable could evaporate at any time and that SunTrust was under a duty to investigate. There is no question, however, that Debtor possessed knowledge that Sun Trust did not possess. That knowledge was in regard to facts not in any public record. SunTrust shall not be held to constructive notice of those facts,

nor shall Debtor be permitted to successfully defend by contending that Sun Trust was negligent in failing to investigate what Debtor already knew and was under a duty to disclose. I find that disclosure of BWC's "demise" would have been material to Sun Trust's renewal decision, especially in light of successor CWC's pledge of its assets to another lender.

The final question is whether SunTrust was harmed by relying on Debtor's silence in twice renewing the note. I find that it was harmed. Because payments were still being made in BWC's name on the date of the first renewal, the first harm was the right to collect receivables outstanding on that date. In addition, although at some point early in 1998 Debtor had begun to deposit those receipts into the CWC account, SunTrust may have been able to trace payments that had already been deposited. The second harm was that, because SunTrust was not aware that BWC's accounts receivables were about to disappear, SunTrust lost the right to replace that security interest with another as a condition of renewing the note. Debtor had assets at that time, and Debtor's newly established corporation CWC had assets as well. After August 14, 1998, any available CWC assets were pledged to Kingsland, and after July 14, 2000, Debtor sold assets he owned to CHA. By the time SunTrust became aware that BWC's receivables were no longer available as security, it was too late to pursue those avenues.

I conclude, therefore, that in relying on Debtor's silence regarding the nonexistence of BWC accounts receivables at the time of the renewals, Sun Trust was induced to renew the note. The dollar amount of the resulting harm, which is not readily ascertainable, is irrelevant, in that this is not an action based on fraud whereby a specific dollar amount in damages must be proven. Section 523(a)(2) excludes from discharge from *any debt* for obtaining the renewal of credit by fraud or false pretense.

Because Debtor obtained renewals on the loan by false pretenses, because Debtor intended to induce SunTrust's reliance on those pretenses, and because SunTrust relied to its detriment on those false pretenses, I conclude that § 523(a)(2) applies to exclude the debt from discharge. I need not rule on the grounds asserted under 11 U.S.C. §§ 523(a)(4) and 523(a)(6).

### ORDER

Pursuant to the foregoing, IT IS THE ORDER OF THIS COURT that Richard L. Brandon's debt to SunTrust Bank in the amount of $210,029.23 plus interest and attorney's fees, IS NOT DISCHARGEABLE.