In re Vincent A. ROBERTI, Debtor.

RESOLUTION TRUST CORPORATION, as Receiver of Coastal Federal Savings Bank, FSB, Successor to Coastal Savings Bank, FSB, Substituted Plaintiff,

v.

Vincent A. ROBERTI, Defendant.

Bankruptcy No. 93–52894.
Adv. No. 93–5282.

United States Bankruptcy Court,
D. Connecticut.

June 30, 1995.

Leeland J. Cole–Chu, Cole–Chu & Cipparone, New London, CT, for plaintiff.

Kevin L. Burns, Owens, Schine, Nicola & Donahue, P.C., Trumbull, CT, for defendant.

## MEMORANDUM AND ORDER ON PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

ALAN H.W. SHIFF, Bankruptcy Judge.

The plaintiff in this nondischargeability action alleges that the defendant-debtor fraudulently induced the plaintiff into making a loan to a nonexistent corporation of which the debtor represented he was the president. Each party has moved for summary judgment: the plaintiff, on the ground that a state court default judgment collaterally estops the debtor from relitigating the factual issues that establish his alleged fraud; and the debtor, on the traditional ground that the undisputed facts cannot, as a matter of law, support a judgment of nondischargeability against him. For the reasons that follow, both of those motions are denied.

## BACKGROUND

### 1. The loan

Plaintiff Resolution Trust Corporation ("RTC"), as successor in interest to Coastal Savings Bank, FSB ("Coastal Savings"), commenced this adversary proceeding on December 13, 1993. The complaint alleges that on or about December 1, 1989, Coastal Savings agreed to provide a $250,000 line of credit to a borrower which the debtor represented to be a Connecticut corporation named "Westledge/Boyer Realty II, Corp." ("Westledge/Boyer"). The debtor signed a note as "President Duly Authorized" of Westledge/Boyer. *See* Affidavit of W. Paul Kaminski, Jr., filed October 3, 1994 ("Kaminski Affidavit"), Exhibit A. A borrowing resolution given to Coastal Savings stated that Westledge/Boyer was an organized and existing Connecticut corporation and that the loan and the execution of the loan documents had been authorized at a meeting of the board of directors in accordance with the charter and by-laws of Westledge/Boyer. *See* Kaminski Affidavit, Exhibit C. That resolution was signed only by an individual purporting to be the secretary of Westledge/Boyer, but RTC claims that the debtor authorized its execution and delivery to Coastal Savings. The debtor also signed a personal guaranty of Westledge/Boyer's debt and a signature card under the Westledge/Boyer name. *See* Kaminski Affidavit, Exhibit B. The debtor allegedly represented that Westledge/Boyer was organized to purchase a real estate business known as Boyer Real Estate ("Boyer") and that that entity intended to open and maintain an escrow account at Coastal Savings with balances of up to $500,000.

It is undisputed that Westledge/Boyer did not exist at the time the loan documents were executed, or at any time before or after that date. RTC alleges that the debtor committed fraud and forgery when he signed the note, guaranty and signature card and authorized the execution and delivery of the borrowing resolution. RTC further alleges that the fraud and forgery were intended to induce the extension of credit by Coastal Savings and were made either knowingly or with reckless indifference to their truth or falsity. RTC further claims that the debtor failed to

pursue the purchase of Boyer or establish an escrow account at Coastal Savings. RTC asserts that Westledge/Boyer never made any payments on the line of credit. The debtor as guarantor made some payments but defaulted in March of 1991.

### 2. State court proceedings and RTC's motion for summary judgment

On August 29, 1991, Coastal Savings sued the debtor for breach of contract, unjust enrichment, fraud, forgery, and theft in the Connecticut Superior Court. The debtor did not appear in that action and a default judgment entered against him on January 7, 1992 in the amount of $817,156.16 plus costs of $350.70 (the "Default Judgment"). *See* Kaminski Affidavit, Exhibit I. The Default Judgment included treble damages for theft, double damages for forgery, punitive damages for fraud, and contract damages. Coastal Savings presented limited evidence to the state court on the issue of damages, but no evidence was presented on the merits of the underlying action. Indeed, the state court judge stated at the hearing following which the Default Judgment entered: "[Y]ou don't have to repeat anything that's in the affidavit [of debt], so you can assume the Court has read that and finds it to be true, since there are no contradictions to it." *Tr.*, Dec. 4, 1991, p. 5, Kaminski Affidavit, Exhibit G. Following the damages hearing, counsel for Coastal Savings prepared, and the state court judge signed, the Default Judgment, which found the material allegations of the complaint to be true.

While the debtor did not appear in the main action, on September 18, 1992, he moved to reopen the judgment based on improper service of process to a Connecticut address. *See* Kaminski Affidavit at ¶ 25. Specifically, the debtor alleged that "abode" service authorized by Conn.Gen.Stat. § 52–57, that is, service by leaving the summons and complaint at the debtor's "usual place of abode," was ineffective because the debtor resided in Florida on the date of service. *See* Motion to Open and Vacate Judgment, Kaminski Affidavit, Exhibit K. The motion to reopen alleged that the debtor "had no knowledge of the pendency of this action at

the time judgment was entered, nor within four months thereafter," Motion at ¶ 4, and an affidavit of the debtor purported to verify that allegation.[1]

An evidentiary hearing on the motion to reopen was held on November 23, 1992. *See Tr.*, Kaminski Affidavit, Exhibit L. The debtor offered testimony that he had moved to Florida in late May or early June of 1991, and continued to reside there at the time of purported abode service in October of 1991. He presented a variety of corroborative evidence, including a Florida driver's license and a Florida voter's registration card issued in June of 1991. Coastal Savings presented evidence indicating that the debtor did reside at the abode service address, including the receipt of collect telephone calls by the debtor in Connecticut in September of 1991, and the sheriff's testimony that a boy at the abode service address had stated to the sheriff that the debtor and the debtor's wife were out to dinner at the time service was attempted. On January 4, 1993, the state court issued a memorandum of decision denying the motion to reopen. Kaminski Affidavit, Exhibit M. After holding that the debtor bore the burden of proof on the motion to reopen, Memorandum at p. 4, the state court reviewed the facts, which it found to "cast grave doubt on [the] defendant's credibility," and concluded that the debtor did not satisfy his burden. *Id.* at p. 10. After receiving that adverse ruling, the debtor commenced a new action seeking to have the Default Judgment set aside, but proceedings in that action were stayed when the debtor commenced this case on September 3, 1993. Kaminski Affidavit, ¶¶ 29–30.

The First Count of the instant adversary proceeding seeks to have the full amount of the Default Judgment declared nondischargeable under § 523(a)(2)(A). The Second Count alleges that the debtor submitted to Coastal Savings Bank materially false financial data and projections for the business of Westledge/Boyer, and seeks a determination that the debt is nondischargeable under § 523(a)(2)(B). The Third Count seeks a determination that the debt is nondischargeable under § 523(a)(4). On October 3, 1994, RTC filed a motion for summary judgment on all counts on the ground that the Default Judgment is entitled to collateral estoppel effect in this court.

### 3. The debtor's motion for summary judgment

On September 14, 1994, the debtor filed a motion for summary judgment on all counts, supported by a Statement of Facts Pursuant to Local [District Court] Rule 9(c) (the "Debtor's Statement"). The Debtor's Statement alleges that an entity known as "The Roberti Group II, Inc." was incorporated under the laws of Delaware on August 23, 1989. That entity changed its name to "Westledge Real Estate II Corporation" ("Westledge") on September 5, 1989 and became authorized to do business in Connecticut. The debtor was the president of Westledge. In August of 1989, Westledge acquired the business of Boyer, and proceeded to do business in Southeastern Connecticut under a variety of names, including "Westledge/Boyer Real Estate," "Westledge Real Estate/Boyer Real Estate," "George Boyer Residential Agency," "Boyer Agency," and "Westledge Real Estate." Debtor's Statement at ¶ 6.[2] The debtor acknowledges executing the note, guaranty, and signature card, and that he knew of the borrowing resolution, all of which contained the name of Westledge/Boyer. The debtor claims, however, that those documents were prepared by Coastal Savings employees who simply made a mistake as to the corporate name. The debtor allegedly never misrepresented that name to any Coastal Savings employee either before or after the transaction and never realized that

---

1. Four months after rendition of the judgment is the general time limit within which a motion to reopen must be filed under Connecticut law. *See* Rules for the Superior Court of Connecticut §§ 326, 377 (West 1995). The debtor argued that that time limitation did not apply where the motion to reopen alleged a failure of jurisdiction over the defendant's person.

2. The debtor's sworn affidavit states that Westledge acquired Boyer in September, rather than August, of 1989. *See* Debtor's Affidavit (hereinafter defined) at ¶ 6. Either the Debtor's Statement or the Debtor's Affidavit therefore contains an incorrect statement. It is irrelevant for the purposes of this opinion which is incorrect.

the name was incorrect as typed. Debtor's Statement at ¶¶ 13–16. The debtor states that the two names—i.e. "Westledge/Boyer Realty II, Corp." as typed on the loan documents, and "Westledge Real Estate II Corporation"—"can honestly be read as one in the same." Affidavit of Vincent A. Roberti in Support of Defendant's Motion for Summary Judgment, filed September 14, 1994 ("Debtor's Affidavit"), ¶ 12. Westledge used all of the proceeds of the loan in its real estate business, which made payments on the loan throughout 1990 and for part of 1991. Debtor's Statement at ¶¶ 18, 20. However, the debtor acknowledges that $155,000 of the proceeds was deposited in his personal account, but claims that he transferred those proceeds to Westledge's account the same day. *Id.* at ¶ 19.

As to the Second Count, seeking a declaration of nondischargeability under § 523(a)(2)(B), the debtor argues that none of the financial data and projections submitted to Coastal Savings contained the name of Westledge/Boyer. There was therefore no written misrepresentation on those documents upon which Coastal Savings could have relied. *See* Memorandum of Law in Support of Defendant Vincent A. Roberti's Motion for Summary Judgment, filed September 14, 1994 ("Debtor's Memorandum"), at p. 19.

As to the Third Count, alleging larceny pursuant to § 523(a)(4), the debtor claims that under federal common law, larceny requires a finding that the debtor, with fraudulent intent, took the property of another. Debtor's Memorandum at pp. 20–21. The debtor asserts that there was no fraudulent intent. The debtor further asserts that there is no evidence that he personally used the funds, as opposed to Westledge. The debtor also argues that he owed no fiduciary duty to Coastal Savings, which he asserts is a requirement under § 523(a)(4) even where a plaintiff alleges embezzlement or larceny.

In accordance with Local Rule of Civil Procedure 9(c)(2), RTC filed a statement on November 7, 1994 (the "RTC's Statement"), which indicates that most of the debtor's material allegations are controverted.

## DISCUSSION

### 1. Summary judgment standard and governing code sections

 The Second Circuit has recently reiterated the summary judgment standard as follows:

> Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The non-moving party may defeat the summary judgment motion by producing specific facts sufficient to establish that there is a genuine issue of material fact for trial. " '[M]ere conclusory allegations or denials' " in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

*Gallien v. Connecticut Gen. Life Ins. Co.,* 49 F.3d 878, 881–82 (2d Cir.1995) (some citations omitted; emphasis in original). The burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists. *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d

1219, 1223 (2d Cir.1994). That burden may be satisfied by showing that little or no evidence may be found in support of the non-moving party's case. *Id.* at 1223–24. There is no genuine issue of material fact when no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight. *Id.* at 1224. "Summary judgment is proper only when reasonable minds could not differ as to the import of the evidence." *Sure–Trip, Inc. v. Westinghouse Eng'g,* 47 F.3d 526, 533 (2d Cir. 1995).

This proceeding is brought under § 523(a)(2) and (4), which provide in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

### 2. The RTC's motion: collateral estoppel effect of a default judgment

The RTC argues that since the debtor raised and lost the issue that he was not properly served in the action that resulted in the Default Judgment he may not now raise the issue of whether his alleged fraudulent behavior was "actually litigated." I disagree.

In *Grogan v. Garner,* 498 U.S. 279, 285 n. 11, 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991), the Supreme Court clarified that "collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)." Bankruptcy and federal appellate courts have increasingly moved toward a consensus that, in the absence of an exception to the application of the Full Faith and Credit doctrine, bankruptcy courts must apply the collateral estoppel rules of the state in which the rendering court sits. As this court held in *Tavella v. Edwards (In re Edwards),* 172 B.R. 505, 521–22 (Bankr.D.Conn.1994):

Pursuant to 28 U.S.C.A. § 1738 (West 1994), the properly authenticated records and judicial proceedings of any state court "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." That doctrine, which dates from 1790, "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Marrese v. Am. Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985); *see also Burka v. New York City Transit Auth.,* 32 F.3d 654, 657 (2d Cir.1994) ("[A] state court judgment has the same preclusive effect in federal court as the judgment would have had in state court."); *Long Island Lighting Co. v. Imo Indus., Inc.,* 6 F.3d 876, 885 (2d Cir. 1993). Bankruptcy courts are subject to that mandate, and are bound by determinations made in a state court judgment unless the judgment was procured by fraud or the state court lacked jurisdiction. . . .

Under *Marrese,* unless federal law creates an exception to § 1738, a federal court must apply state collateral estoppel rules.

A majority of courts have adopted a similar analysis. *See, e.g., Fleet Consumer Discount Co. v. Graves (In re Graves),* 33 F.3d 242, 247 (3d Cir.1994); *Nourbakhsh v. Gayden (In re Nourbakhsh),* 162 B.R. 841, 843 (9th Cir. BAP 1994); *North Tel., Inc. v. Brandl (In re Brandl),* 179 B.R. 620, 623 (Bankr.

D.Minn.1995); *Staggs v. Forrester (Matter of Staggs)*, 177 B.R. 92, 95 (N.D.Ind.1995); *Sutton v. Holland (In re Holland)*, 155 B.R. 745, 747 (Bankr.S.D.Ind.1992). Some courts have found that federal law creates an exception to the application of state collateral estoppel rules when the issue before the bankruptcy court involves dischargeability proceedings that are within the exclusive jurisdiction of the bankruptcy courts, i.e. proceedings under § 523(a)(2), (4), or (6). I have not followed that analysis. *See, e.g., In re Edwards, supra*, 172 B.R. at 523 ("Even as to the proceedings within the exclusive jurisdiction of the bankruptcy courts, Supreme Court precedent indicates that while res judicata may not be applied, collateral estoppel may."). Some courts have agreed with *Edwards, see, e.g., Spartz v. Cornell (In re Cornell)*, 178 B.R. 45, 48 (Bankr.D.Conn.1995); *Rally Hill Prods., Inc. v. Bursack (In re Bursack)*, 163 B.R. 302, 307–08 (Bankr.M.D.Tenn.1994), and others have not, *see, e.g., Montgomery v. Kurtz (In re Kurtz)*, 170 B.R. 596, 599 (Bankr.E.D.Mich.1994); *Tulin v. Recck (In re Recck)*, 167 B.R. 93, 96–97 (Bankr. N.D.Ohio 1994).[3] In any event, because state preclusion law governs, and in light of my determination *infra* that a Connecticut court would not afford issue preclusive effect to the Default Judgment, I need not address the exception controversy in detail.[4]

■ While claim preclusion, i.e., res judicata, which does not require actual litigation, generally applies to valid default judgments, collateral estoppel often does not. *See Crispino v. Chemical Bank New Jersey (In re Crispino)*, 160 B.R. 749, 755 (Bankr. D.N.J.1993). Because of the requirement that an issue have been actually litigated in the prior proceeding, it has been held that "collateral estoppel rarely applies to default judgments awarded in a nonbankruptcy forum so as to make those default judgments nondischargeable." *Goff v. Internal Revenue*

*Serv. (In re Goff)*, 180 B.R. 193, 199 (Bankr. W.D.Tenn.1995); *see Kulesa v. Stankovich (In re Stankovich)*, 171 B.R. 27, 30 (Bankr. E.D.Va.1994); *Brose v. Hubbard (In re Hubbard)*, 167 B.R. 969, 973 (Bankr.D.N.M.1994) (following "the majority and better view that the actually litigated requirement should be construed narrowly" so as not to include default judgments). Ultimately, however, that issue turns upon the preclusive effect of default judgments under state law. *See, e.g., In re Graves, supra*, 33 F.3d at 248 ("[D]efault judgments are not given preclusive effect in Pennsylvania's courts."); *Jones v. Indiana Fin. Co.*, 180 B.R. 531, 533 (S.D.Ind. 1994) (refusing to give collateral estoppel effect to default judgment for treble damages under state statute).

■ While the application of collateral estoppel in any given case will vary depending on which state's law is applied, a review of the case law identifies two general trends which may be of assistance in the instant case. First, courts are more likely to afford collateral estoppel effect to default judgments where the defendant has participated in the case to some degree, and less likely to do so where the defendant never appeared or filed any paper. *See, e.g., In re Nourbakhsh, supra*, 162 B.R. at 846 (applying collateral estoppel to default judgment where defendant's counsel appeared in the prior proceeding, filed and argued a motion to dismiss, served answers to interrogatories, and appeared at a hearing on motion to dismiss); *Bay Area Factors v. Calvert (In re Calvert)*, 177 B.R. 583, 588 (Bankr.W.D.Tenn.1995) (no collateral estoppel effect where there was no evidence in the record that the debtor had appeared in the prior proceeding); *Burgess v. Martin (In re Martin)*, 171 B.R. 395, 398 (Bankr.N.D.Ala.1994) (no collateral estoppel where defendant never appeared even though default judgment contained a finding that the debtor's actions were malicious);

---

**3.** Most courts finding an exception to Full Faith and Credit do so under the authority of the Sixth Circuit's decision in *Spilman v. Harley*, 656 F.2d 224 (6th Cir.1981). That decision is not, of course, binding precedent in the Second Circuit.

**4.** Were the federal standard applicable here, it is noted that that standard generally does not af-

ford preclusive effect to a default judgment. *See* 1B James Wm. Moore, Moore's Federal Practice, ¶ 0.444[2], at pp. III.–603—III.–604 (2d ed. 1995); *M & M Transmissions, Inc. v. Raynor (In re Raynor)*, 922 F.2d 1146, 1149–50 (4th Cir. 1991); *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir.1981).

*Matter of Staggs, supra,* 177 B.R. at 97–98 (affording collateral estoppel effect to judgment arising from unopposed motion for summary judgment even though controlling law did not afford collateral estoppel effect to a default judgment against a defendant who never appeared in the action). Second, courts are more likely to afford collateral estoppel effect to default judgments that are entered as a sanction against the defendant for dilatory or otherwise improper litigation tactics. For example, in *Fed. Deposit Ins. Corp. v. Daily (In re Daily),* 47 F.3d 365 (9th Cir.1995), a default judgment was entered against the defendant-debtor in a district court action as a sanction against the debtor for strategically delaying that action for nearly two years. The Ninth Circuit found that the "actually litigated" requirement was satisfied because the debtor had "deliberately preclude[d] resolution of [the] factual issues through normal adjudicative procedures...." *Id.* at 368; *accord Keller v. Blinder (In re Blinder, Robinson & Co., Inc.),* 162 B.R. 555, 560 (D.Colo.1994) (collateral estoppel effect afforded to default judgment entered after repeated failure to comply with discovery requests).

■ With those general principles in mind, I examine Connecticut law. Under that law, collateral estoppel applies to an issue that was actually litigated and necessarily determined in a prior action between the same parties on a different claim. *Carol Management Corp. v. Bd. of Tax Review of the Town of Greenwich,* 228 Conn. 23, 32, 633 A.2d 1368 (1993).

> "An issue is *'actually litigated'* if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined." (Emphasis added). 1 Restatement (Second), Judgments, § 27, comment (d) (1982). An issue is *necessarily determined* if, 'in the absence of a determination of the issue, the judgment could not have been validly rendered.' F. James & G. Hazard, Civil Procedure (3d Ed.1985) § 11.19."

*Id.,* 228 Conn. at 32–33, 633 A.2d 1368 (quoting *Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 714–15, 627 A.2d 374 (1993)). The instant dispute centers on whether the issues raised in this adversary proceeding were "actually litigated" in the state court proceeding that resulted in the Default Judgment. The parties agree that the most recent pronouncement of the Connecticut Supreme Court on the collateral estoppel effect of default judgments, as stated in *Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 627 A.2d 374 (1993), controls the resolution of this issue.

In *Jackson,* a mobile home park owner brought a collection action against a tenant of the park. Prior to the commencement of that action, the tenant had allegedly moved to her mother's mobile home on an adjoining lot. A prejudgment attachment and motion for default judgment were served on the tenant at her former residence, which the park owner argued was her "usual place of abode" within the meaning of Conn.Gen.Stat. § 52–57. The default judgment entered, and the tenant moved to reopen. Her motion was denied, and the tenant commenced a new action wherein she alleged, *inter alia,* that she had not received proper notice of the attachment and motion for default judgment and that the park owner had intentionally sent those documents to the wrong address. The trial court held that collateral estoppel precluded the tenant from raising those issues.

On appeal, the Connecticut Supreme Court held:

> Whether a prior default judgment has issue preclusive effect in a subsequent action involving a different cause of action has not been settled by this court. The Restatement adopts the position that "presence" of the parties is a necessary condition for a matter to be "actually litigated" for the purpose of issue preclusion. In the comments to the section on issue preclusion in the Restatement, it is stated that "[i]n the case of a judgment entered by confession, consent, or *default,* none of the issues is actually litigated." (Emphasis added.) 1 Restatement (Second), Judgments § 27, comment (e) (1982)....

> The Restatement's position that a default judgment is incapable of generating issue preclusion is, however, at odds with many courts that have held that default judg-

ments are conclusive of the issues determined by such a judgment. Federal courts, however, seem to have endorsed the Restatement's position. Similarly, academic commentary on this issue is divided. The Restatement's requirement that an issue be "actually litigated" embodies the important concern that the parties be cognizant of and interested in an issue before they are precluded from litigating it. Adherence to this requirement, however, should not demand that in all circumstances a default judgment should mechanically be deprived of any issue preclusive effect. Such a demand would make inflexible the doctrine of issue preclusion, which we have noted " 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' *Sealfon v. United States,* 332 U.S. 575, 579 [68 S.Ct. 237, 239, 92 L.Ed. 180 (1948) ]." *State v. Aparo,* 223 Conn. 384, 390, 614 A.2d 401 (1992), cert. denied, —— U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

Although not every default judgment should have the same issue preclusive effect as an actual adjudication between the present parties, in the interest of judicial economy and repose for litigants, we envision some circumstances where it would be appropriate to give issue preclusive effect to a default judgment. We have previously noted, after addressing the scope of issue and claim preclusion, that the appropriate inquiry with respect to both types of preclusion is whether the party had an "*adequate opportunity* to litigate the matter in the earlier proceeding...." (Internal quotation marks omitted.) *State v. Ellis, supra,* [197 Conn. 436,] 464–65 n. 22, [497 A.2d 974 (1985) ], quoting D. Currie, "Res Judicata: The Neglected Defense," 45 U.Chi.L.Rev. 317, 342 (1978). Our decision in *Ellis* indicates that had there been a full and fair opportunity to litigate issues and such issues were necessary to a default judgment, that judgment should put to rest subsequent litigation of all issues necessary for the rendering of the default judgment.

Under the circumstances of this case, it is unclear whether the prior collection action afforded the plaintiff a full and fair opportunity to litigate the issues that the trial court later precluded from litigation with respect to the plaintiff's claims of abuse of process. The defendants maintain that the hearing on the plaintiff's motion to open the default judgment pursuant to General Statutes § 52–212 provided this full and fair opportunity to contest the issues in question and that these issues were actually litigated and necessarily determined. Although the plaintiff's motion and the argument thereon did address several issues subsequently raised in her abuse of process action, it is unclear whether the trial court's ruling on her motion to open in the collection action, gave preclusive effect to the issues argued during the hearing on that motion.... The trial court's ruling in the collection action did not, however, indicate on what basis it denied the plaintiff's motion. We cannot say, therefore, that she was afforded a full and fair opportunity to explore the factual issues she later sought to litigate in her abuse of process claims. Nor can we conclude that the default judgment in the collection action "necessarily determined" all of the issues that were later precluded.

225 Conn. at 715–720, 627 A.2d 374 (footnotes and some citations omitted).

 Actual litigation under Connecticut law requires a "full and fair opportunity to litigate." *Jackson* provides guidance as to what constitutes such a full and fair opportunity. It is apparent, however, that *Jackson* cannot be read to support the argument that every defendant who was properly served has had a full and fair opportunity to litigate factual issues determined by a subsequent default judgment. *See, e.g., Numberg v. Twaite,* Case No. 34 20 10, 1994 WL 146038, *3 (Conn.Super.Ct., April 15, 1994) ("[A] party who, though within the jurisdiction of the court through compliance with § 52–62 C.G.S., has not appeared is not precluded from asserting her own claim arising from the same collision after suffering a default judgment."). Adequacy of personal service is a *sine qua non* of a valid default judgment, yet *Jackson* teaches that some valid default judgments should not be afforded issue pre-

clusive effect. *Jackson* holds that issue preclusion is a flexible doctrine which " 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' " In the final analysis, a full and fair opportunity to litigate becomes a question of fact under Connecticut law.

▮▮▮▮ In this proceeding, there are material factual disputes as to whether the debtor has been given a full and fair opportunity to litigate which preclude me from granting the RTC's motion notwithstanding the fact that the debtor raised and lost the issue of the adequacy of notice of the commencement of Coastal Savings' action against him. RTC argues, with considerable force, that the Superior Court's finding that abode service was adequate is entitled to preclusive effect here, so that the debtor cannot argue that he lacked a full and fair opportunity to litigate. I agree with the premise, but not the conclusion. The Superior Court decision upheld the validity of the Default Judgment against a personal jurisdiction challenge, and the debtor cannot challenge the judgment on that ground in this court. It is significant that under Connecticut procedural rules, where a defendant files a motion within four months after a default judgment was rendered which states a valid defense and demonstrates that appearance was prevented by mistake, accident, or other reasonable cause, the judgment will be set aside. Conn.Gen. Stat.Ann. § 52–212 (West 1991); Rules for the Superior Court of Connecticut §§ 326, 377 (West 1995).

The debtor's deposition testimony indicates that he was not aware of the state court action against him until June of 1992, or about six months after the Default Judgment entered. If the debtor's version of the events is credited, as it must be when RTC's motion for summary judgment is considered, he did not make the motion within the four month time period because he did not know of the entry of the Default Judgment until after that time period had expired. *See In re Holland, supra,* 155 B.R. at 749 (in connection with creditor's motion for summary judgment based on the collateral estoppel effect of a default judgment, "the Court will accept the debtor's representations as true, and assume that he did not receive information of the trial date."). The Superior Court merely determined that service was made to the debtor's "usual place of abode." It did not determine whether the debtor had actual knowledge of the pendency of the state court action and therefore a full and fair opportunity to litigate. The absence of that determination is fatal to RTC's argument that collateral estoppel is applicable. *Cf. In re Graves, supra,* 33 F.3d at 247 (state court's refusal to reopen default judgment did not collaterally estop debtor from raising lack of notice in bankruptcy court, where state court made no finding that the debtor received actual notice). By contrast, the court in *In re Cornell, supra,* 178 B.R. at 45, applied *Jackson* to afford collateral estoppel effect to a default judgment where it was undisputed that "[a]lthough the debtor did not appear in the state proceeding, he was aware of the proceeding, and not precluded by distance, accident or mistake from appearing. He was afforded an adequate opportunity to litigate, and chose not to." 178 B.R. at 49.[5]

▮▮▮▮ The mere fact that the state court heard limited evidence on the issue of damages does not change that result. The clerk of the state court entered a default against the debtor on November 5, 1991, and

---

5. The cases relied upon by Coastal Savings are distinguishable either on the ground that different law was applied, that the debtor was found to have chosen not to participate knowing the consequences of that decision, or that the operative preclusion principle was claim preclusion, which does not require actual litigation, rather than collateral estoppel. *See, e.g., Kelleran v. Andrijevic,* 825 F.2d 692, 695 (2d Cir.1987) (applying New York law and apparently involving claim preclusion), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988); *Melnick v. Seifert (In re Seifert),* 130 B.R. 607, 609 (Bankr.M.D.Fla.

1991) (applying Florida law and finding that the debtor "knowingly chose not to defend himself"), *Equity Mortgage, Inc. v. Johnson (Matter of Johnson),* 149 B.R. 284, 287 (Bankr.D.Conn.1993) (claim preclusion).

In light of my conclusion that the Default Judgment should not be afforded collateral estoppel effect because it was not actually litigated, I need not address whether the issues addressed there are identical to those presented here. *See, e.g., Metromedia Co. v. Fugazy,* 983 F.2d 350, 365 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

the hearing at which the Default Judgment entered was "a hearing in damages on the Complaint." Kaminski Affidavit at ¶¶ 19, 20. The Default Judgment itself makes it clear that the hearing was only in relation to damages. *See* Kaminski Affidavit, Exhibit J, p. 1. The only substantive testimony offered at that hearing was the statement of Mr. W. Paul Kaminski, Coastal Savings' loan officer, verifying the allegations of the complaint. *See Tr.,* Dec. 4, 1991, p. 5, Kaminski Affidavit, Exhibit B. *Cf. Vaughn v. Quinn (In re Quinn),* 170 B.R. 1013, 1016 (Bankr.E.D.Mo. 1994) (affording collateral estoppel to judgment where defendant filed answer but did not appear for trial, where plaintiff presented evidence on liability to the trial court and the judgment did not rely on the defendant's failure to appear); *In re Holland, supra,* 155 B.R. at 750 (bankruptcy court declined to afford collateral estoppel effect to state court default judgment notwithstanding that a hearing was conducted to set damages after default judgment was granted).[6]

### 3. The debtor's motion: genuine issues of material fact

#### a. Were the funds "obtained"?

■ An initial hurdle to RTC's claims under § 523(a)(2)(A) and (B) is whether the debtor, as distinguished from Westledge, actually obtained the proceeds of the loan from Coastal Savings. As the court noted in *Jacobs v. Mones (In re Mones),* 169 B.R. 246, 251 (Bankr.D.D.C.1994), there are three approaches to this question: either the debtor must have actually received the fraudulently procured funds himself or herself; or the debtor must have received some benefit from the funds; or the debtor need not have received any benefit from the funds, so long as he or she was the perpetrator of the fraud. Most courts have held that, even where the property is actually disbursed to an entity

related to the debtor, a nondischargeability action may be maintained against the debtor where the debtor received a direct or indirect benefit from the funds. *Id.* at 252; *Luce v. First Equip. Leasing Corp. (Matter of Luce),* 960 F.2d 1277, 1283 (5th Cir.1992); *Emergency One, Inc. v. Jones (In re Jones),* 176 B.R. 629, 635 (Bankr.M.D.Fla.1995) ("[I]f an officer of a corporation has obtained money or property for the corporation through fraud he will not be shielded by the corporate form."); *Arm v. A. Lindsay Morrison, M.D., Inc. (In re Arm),* 175 B.R. 349, 353 (9th Cir. BAP 1994); *Sears, Roebuck and Co. v. Naimo (In re Naimo),* 175 B.R. 878, 881 (Bankr. E.D.Pa.1994), *aff'd,* 1995 WL 163598 (E.D.Pa., Apr. 6, 1995); *Bates v. Winfree (In re Winfree),* 34 B.R. 879, 883 (Bankr. M.D.Tenn.1983).

There is sufficient evidence of benefit to the debtor individually to defeat a summary judgment motion on that ground. The debtor admits having received a portion of the loan proceeds into his personal account, *see* Debtor's Statement at ¶ 19. The check which allegedly transferred those funds from the debtor's personal account to that of Westledge (which the debtor claims was written without his knowledge, *see* Debtor's Affidavit at ¶ 16) bears the notation "Loan to Westledge," which could suggest that the funds represented a loan from the debtor to Westledge. *See* Debtor's Affidavit, Exhibit J. The record also suggests that the debtor was in a position to completely dominate the affairs of Westledge. He was willing to execute the loan documents, for example, without the formality of having obtained borrowing resolutions from his board of directors. The record thus does not negate the possibility of piercing of the corporate veil. *See Hodnett v. Loevner (In re Loevner),* 167 B.R. 824, 826 (Bankr.E.D.Va.1994).

---

**6.** In reaching the conclusion that RTC is not entitled to summary judgment in its favor, I need not define the precise parameters of "full and fair opportunity to litigate" under the *Jackson* standard. It is noted, however, that where the evidence demonstrates that a debtor chose not to appear in a state court action notwithstanding a meaningful opportunity to do so, the debtor should not be permitted to forum shop by commencing an action in this court on the same issue. It is further noted that not every default judgment based on abode service will fail to meet the standard of actual litigation. For example, a debtor who evades personal service or, through subterfuge, conceals the usual place of abode, should not be heard to claim a lack of adequate opportunity to litigate.

### b. Section 523(a)(2)(A)

In order to prove that a debt is nondischargeable under § 523(a)(2)(A), the plaintiff must show:

(1) the debtor made the false representation;

(2) that at the time the debtor knew it was false;

(3) that the debtor made the representation with the intention and purpose of deceiving the creditor or inducing the creditor to act to his or her detriment;

(4) that the creditor relied on the representation to his or her detriment; and

(5) that the false representation was the proximate cause of the creditor's loss.

*DeVengoechea v. Barnett (In re Barnett)*, 115 B.R. 22, 24 (Bankr.D.Conn.1990); *Mechanics and Farmers Sav. Bank v. Fosco (In re Fosco)*, 14 B.R. 918, 920 (Bankr.D.Conn. 1981); *Union Bank of the Middle East, Ltd. v. Luthra (In re Luthra)*, 182 B.R. 88, 92 (E.D.N.Y.1995).

*1. False representation.* I conclude that there is ample evidence to support a finding that the debtor stated that Westledge/Boyer was an existing corporation and that he was its president, and that those statements were false. The debtor admits having signed the note, guaranty, and signature card, and apparently knew of the borrowing resolution and arranged for its execution. *See* Debtor's Statement at ¶¶ 8, 9; Deposition of Vincent A. Roberti, April 29, 1994 (Debtor's Deposition), filed Nov. 7, 1994, pp. 31, 58. Even if the debtor made no other representation as to the corporate status of Westledge/Boyer and his position as its officer, the existence of the signed documents is sufficient to defeat the debtor's motion for summary judgment. *See In re Arm, supra,* 175 B.R. at 353 (bonds issued by trust constituted representation that trust was prepared to honor them, even absent verbal misrepresentation by debtor-affiliate of trust). Further, deliberate nondisclosure of a material fact may amount to a "false pretense" under § 523(a)(2)(A). *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 993 (Bankr.M.D.N.C. 1994); *Durbin v. Miranda (In re Miranda)*, 172 B.R. 55, 60 (Bankr.E.D.Mo.1994). The debtor's failure to disclose that the corporate name on the documents was incorrect was a material nondisclosure.

The debtor asserts that Kaminski, Coastal Savings' loan officer, admitted that the debtor did not misrepresent the name of the corporate borrower in the loan documents. RTC contends that Kaminski testified only that he was aware of no written representation by the debtor that Westledge/Boyer was to be the corporate vehicle to acquire the business of Boyer and that Westledge/Boyer would maintain a $500,000 escrow account at Coastal Savings. The debtor's submissions are misleading because they omit page 47 of the deposition of Kaminski. *See* Deposition of W. Paul Kaminski, April 29, 1994 ("Kaminski Deposition"), filed November 7, 1994. The testimony recorded on that page makes it clear that Kaminski's statement regarding the absence of a written representation relates only to the purchase of Boyer and the escrow account.

RTC also asserts that the debtor misrepresented the intention of Westledge to acquire the business of Boyer. The debtor alleges that Westledge had acquired that business by August of 1989, that is, before the loan was made. RTC disputes that allegation. *See* Debtor's Statement at ¶ 7; RTC's Statement at ¶ 1. The record does not resolve that genuine issue of material fact, which essentially turns on the credibility of witness testimony. The question of whether the debtor breached a promise to maintain an escrow account at Coastal Savings and whether the debtor intended not to perform that promise at the time he made it are similarly contested.

*2. Knowledge of the statement's falsity and intent to deceive.* Issues involving questions of intent and credibility of witnesses are generally inappropriate for summary judgment. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994); *Coan v. Andersen (In re Andersen)*, 166 B.R. 516, 528 (Bankr.D.Conn.1994). "Intent [to defraud] is rarely provable directly. However, a court may find that a debtor acted with a fraudulent intent after a consideration of the facts and circumstances surrounding a debt-

or's actions." *Hellmann v. Mask (In re Mask)*, 171 B.R. 353, 356 (Bankr.E.D.Mo. 1994). This court and others have held that while a debtor's mere negligence would not support a finding of actual knowledge of falsity and intent to deceive, a showing of reckless indifference to the truth would suffice. *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir.1995); *In re Arm, supra,* 175 B.R. at 354; *Fed. Trade Comm'n v. Duggan (In re Duggan)*, 169 B.R. 318, 324 (Bankr.E.D.N.Y. 1994); *Jacobs v. Ballard (In re Ballard)*, 26 B.R. 981, 986 (Bankr.D.Conn.1983) ("The fraud lies in the fact that a party affirms something to be true for which he has no basis for belief."). "Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act." *In re Duggan, supra,* 169 B.R. at 324. The court should consider the debtor's knowledge and experience in evaluating the debtor's intent. *Id.*

 The debtor points to a number of facts which he claims exonerate him as a matter of law from a claim of actual fraud. For example, he states that the fact that bank personnel typed the loan documents warrants the granting of summary judgment in his favor. That fact does not negate the possibility that the debtor or someone under his employ provided erroneous information to the bank employees. Nor does it negate the possibility that the debtor was reckless in failing to discover the error. Similarly, the debtor cannot hide behind the allegation that he merely "skimmed" the loan documents and did not notice the error in the name of the corporate borrower. *See* Debtor's Deposition, p. 56, Debtor's Affidavit, Exhibit B. *See Commonwealth Land Title Ins. Co. v. Homer (In re Homer)*, 168 B.R. 790, 801 (Bankr.N.D.Ga.1994) ("To choose to remain ignorant of one's representations in a document upon which another is likely to rely is to choose to deceive, if the document contains materially false representations."); *P.H.H. U.S. Mortgage Corp. v. McDowell (In re McDowell)*, 145 B.R. 977, 979–80 (Bankr.

W.D.Mo.1992) (a debtor who signed an affidavit stating that there were no liens on property and failed to ascertain the truth of that statement acted in reckless disregard of the truth).[7] While the debtor states that neither he nor Westledge was represented by counsel at the closing, Debtor's Affidavit at ¶ 10, that excuse is unpersuasive. A lawyer is not necessary to advise the debtor of the name of his corporation. Moreover, if such an excuse were given credit, a borrower would be given a disincentive to employ the services of an attorney so as to protect his or her ability to plead ignorance of the contents of the loan documents at a later date.

The record suggests that the debtor was a sophisticated business man who had been involved in many business transactions. There is support in the record for a finding that the debtor acted with either intent to defraud or at least with reckless indifference to the truth of the representations made.

 *3. Reliance.* The debtor states that reliance under § 523(a)(2)(A) must be "reasonable." In fact, the appropriate standard for reliance under that subsection has been the subject of extensive judicial debate. This court has held that reliance under § 523(a)(2)(A), as opposed to that under § 523(a)(2)(B), must be actual, but need not be reasonable, provided it is not "so unreasonable as to be no reliance at all." *In re Fosco, supra,* 14 B.R. at 922–23; *accord Allison v. Roberts (Matter of Allison)*, 960 F.2d 481, 485 (5th Cir.1992); *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 343 (8th Cir.1987); *Union Bank of the Middle East, Ltd. v. Luthra (In re Luthra), supra,* 182 B.R. at 93–94 ("Where ... the debtor lied to obtain funds and that lie was actually relied upon by a creditor who did not blatantly disregard facts that would have alerted him to the truth, the debtor is not entitled to a discharge."). Other courts have required a showing of reasonable reliance under § 523(a)(2)(A). *See, e.g., First Bank of Colorado Springs v. Mullet (In re Mullet)*, 817

7. The debtor also claimed in his deposition testimony that he is dyslexic, but there is no evidence as to the effect of that condition on his ability to read the loan documents. Even if it prevented him from reading them, arguably his failure to have another review them for accuracy could amount to reckless indifference.

F.2d 677, 679 (10th Cir.1987). Still others have adopted what appear to be various intermediate standards. *See Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454, 1460 (9th Cir.1992) (creditor must show "justifiable reliance" under § 523(a)(2)(A), taking into account circumstances surrounding the transaction and the subjective effect of those circumstances on the creditor); *BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1559–60 (6th Cir.1992) (adopting "loose standard of reasonableness" pursuant to which "dischargeability should not be denied where a creditor's asserted reliance would be so unreasonable as to negate any actual reliance"); *cert. denied*, —— U.S. ——, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993). Whatever label is attached to the standard, there appears to be a discernible trend toward not requiring investigation by the defrauded creditor in order to establish the requisite quantum of reliance. *See, e.g., Mayer v. Spanel Int'l Ltd., supra*, 51 F.3d at 676 ("A victim who lacks access to the truth, and has not been alerted to facts that would alert him to the truth, is not to be … blocked by a discharge under the bankruptcy laws [ ] just because he did not conduct a more thorough investigation."); *Romesh Japra, M.D., F.A.C.C., Inc. v. Apte (In re Apte)*, 180 B.R. 223, 229 (9th Cir.BAP 1995) (investigation by the defrauded party is not a prerequisite to recovery under the Ninth Circuit's justifiable reliance standard). The Supreme Court has recently granted *certiorari* to resolve the dispute. *Field v. Mans*, 36 F.3d 1089 (1st Cir.1994), *cert. granted*, —— U.S. ——, 115 S.Ct. 1821, 131 L.Ed.2d 743 (1995).

I need not revisit the issue of the appropriate standard for reliance under § 523(a)(2)(A) as I conclude that summary judgment is unwarranted under any standard—whether actual, justifiable, or reasonable. Coastal Savings' actual reliance can hardly be questioned, and a rational jury could conclude that Coastal Savings' reliance was reasonable. The deposition testimony does not make it clear that Coastal Savings had a uniform policy of checking corporate existence with the secretary of state or of obtaining an opinion letter from the borrower's counsel. That testimony indicates that there were no such requirements for a loan of this size, which was personally guaranteed, and which was made to a new corporation. Kaminski Deposition at pp. 39–40, Debtor's Affidavit, Exhibit C. *Cf. In re Homer, supra*, 168 B.R. at 802 (lender's failure to follow its own practice of checking plaintiff index of lawsuits did not negate lender's reasonable reliance where there were no "red flags" alerting lender to debtor's misrepresentations). Nor is the evidence conclusive that there was any industry standard governing loans of this type and size. The facts that Coastal Savings did not require a loan application and that the loan committee approved the loan the same day it was made likewise do not conclusively establish an absence of reasonable reliance.[8]

*4. Proximate causation.* RTC's complaint alleges in ¶ 17 of the First Count that Coastal Savings would not have made the loan had it known the true facts. There is substantial evidence to support that assertion. Indeed, it is unimaginable that Coastal Savings would have knowingly made a loan for operating expenses to a nonexistent entity. Further, there is room in the record to suppose that had the actual corporation been obligated on the note and had that corporation acquired Boyer and maintained a large escrow account at Coastal Savings, as that bank was allegedly promised, RTC could have reached other assets to satisfy the loan. In any event, it cannot be said as a matter of law that the false representation was not a proximate cause of RTC's loss.

### c. *Section 523(a)(2)(B)*

A claim under § 523(a)(2)(B) requires proof by a preponderance of the evi-

---

8. Neither party has raised the *D'Oench, Dhume* doctrine and its statutory counterpart in this proceeding. *See* 12 U.S.C.A. § 1823(e) (West Supp.1995); *Langley v. Fed. Deposit Ins. Corp.*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). Recent cases have attempted to define the effect of that doctrine on the requirement of reliance by the lender. *See, e.g., Resolution Trust Corp. v. Hilton*, 182 B.R. 483 (S.D.Miss.1995); *The Cadle Co. v. McKernan (In re McKernan)*, 180 B.R. 350 (Bankr.D.Mass.1995).

dence that the debt was obtained by use of a statement in writing (1) that is materially false, (2) respecting the debtor's or an insider's financial condition, (3) on which the creditor reasonably relied, and (4) that the debtor caused to be made or published with the intent to deceive.

**1. Material falsity; respecting an insider's financial condition.** A statement is materially false if it is not only erroneous but is substantially inaccurate. *Ramsey Nat'l Bank & Trust Co. v. Dammen (In re Dammen),* 167 B.R. 545, 550 (Bankr. D.N.D.1994). It must paint a substantially untruthful picture of the debtor's or insider's financial condition by misrepresenting information of the type that would normally be relied upon in deciding whether or not to extend credit. *Berr v. Fed. Deposit Ins. Corp. (In re Berr),* 172 B.R. 299, 310 (9th Cir. BAP 1994); *Avco Fin. Servs., Inc. v. Abdul'Faruq (In re Abdul'Faruq),* 175 B.R. 618, 622 (Bankr.E.D.Va.1994); *see Afsharnia v. Roland (In re Roland),* 65 B.R. 1003, 1006 (Bankr.D.Conn.1986) (a material falsity is an important or substantial untruth). "The materiality prong of the 'material falsehood' test includes a certain reliance component . . . in the sense that an untruth can be considered important (or 'material') if it influences a creditor's decision to extend credit. However, a statement can still be material if it is so substantial that a reasonable person would have relied upon it, even if the creditor did not *in fact* rely upon it in the case at hand." *Ins. Co. of N. Am. v. Cohn (In re Cohn),* 54 F.3d 1108, 1114 (3d Cir.1995) (emphasis in original).

The debtor appears to argue that since the precise name of Westledge/Boyer did not appear on the financial projections which the debtor provided to Coastal Savings in connection with the loan, RTC could not, as a matter of law, prevail on its claim under § 523(a)(2)(B). I do not read that subsection so narrowly. It simply requires the use of a statement in writing that is materially false. Assuming that the statements provided by the debtor did not contain the precise name of Westledge/Boyer, there is nevertheless evidence to support a finding that those statements were materially false because they led Coastal Savings to believe that they related

to an existing entity, when in fact they did not. RTC claims that the statements fall within § 523(a)(2)(B) not because Coastal Savings relied upon them to obtain the correct name of the borrower, but because it relied upon them as a statement of projected revenues for the corporate borrower which, because of the debtor's allegedly fraudulent representations in the loan documents, Coastal Savings did not know to be a nonexistent entity. Under RTC's version of the facts, there was a single fraudulent scheme carried out in two stages: (1) the debtor led Coastal Savings to believe that Westledge/Boyer was a real entity by his misrepresentations in the loan documents, and (2) the debtor then used the written statements to convince Coastal Savings that the nonexistent entity would be profitable. Both stages were necessary in order to effectuate the alleged fraud.

RTC disputes the allegation that the debtor never represented that the financial information related to Westledge/Boyer. Debtor's Statement at ¶ 17; RTC's Statement at ¶ 7. It is certainly not an unreasonable inference that the statements related to Westledge/Boyer even though the precise name of that corporation did not appear on them. For example, one of the documents entitled "Consolidated Fact Sheet," *see* Debtor's Affidavit, Exhibit E, contains financial information for an entity designated as "Westledge/Boyer Commercial Real Estate." The debtor's personal financial statement shows an asset entry for "Westledge stock upon conversion." *See id.,* Exhibit D. The financial projections through 1995 state that they are for "Roberti Group II," an entity which, by the debtor's admission, no longer existed by December of 1989. *See* Debtor's Statement at ¶ 2. The projections also contain the name "Boyer Real Estate." Coastal Savings may have reasonably believed that the statements related to the new Westledge/Boyer entity as a successor to The Roberti Group II. Nor is there any indication from this record that, as the debtor suggests, *see* Debtor's Memorandum at pp. 18–19, Coastal Savings had information available to it that would have shown it that the documents did not relate to Westledge/Boyer.

**2. *Reasonable reliance.*** Reasonable reliance under § 523(a)(2)(B)(iii) is judged by "an objective standard, i.e., that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." *Ins. Co. of N. Am. v. Cohn (In re Cohn), supra,* 54 F.3d at 1117; *accord Tiffany Promotions, Inc. v. Forman (In re Forman),* 181 B.R. 22, 26 (Bankr.E.D.N.Y.1995). Reasonable reliance requires the consideration of "(1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2) the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a 'red flag' that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations)." *In re Cohn, supra,* 54 F.3d at 1117; *accord In re Dammen, supra,* 167 B.R. at 552; *see Village Bank and Trust Co. of Ridgefield v. Futterman (In re Futterman),* 35 B.R. 102, 104 (Bankr.D.Conn.1983). Reliance is not reasonable where the creditor knows from an independent source that the information is inaccurate. *In re Abdul'Faruq, supra,* 175 B.R. at 623.

As noted *supra,* there is support in the record for a finding that Coastal Savings would not normally have checked state records to verify corporate existence or required an opinion of the borrower's counsel for a loan of this size and type, and the record is inconclusive as to the existence of any industry standard as to such precautions. Nor is there any suggestion of a "red flag" that should have alerted Coastal Savings to the inaccuracies. Those issues are best determined after a trial on the merits.

Kaminski's deposition testimony suggests that Coastal Savings did not check the credit history of the corporate borrower, but only of the debtor individually. As Kaminski explained, however, Coastal Savings believed that the corporate borrower was newly formed and would have no credit history. *See* Kaminski Deposition, p. 11, Debtor's Affidavit, Exhibit C. The failure to review the corporate borrower's credit history does not as a matter of law negate RTC's position that Coastal Savings exercised the degree of care required of a reasonably cautious lender under the circumstances. Further, the fact that Kaminski discovered "derogatory information," i.e. a bankruptcy filing, in the debtor's credit record, makes it more likely that Coastal Savings relied upon the financial projections of the alleged corporate borrower. *Id.*

**3. *Intent to deceive.*** As under § 523(a)(2)(A), intent to deceive may be inferred from all of the circumstances, and a reckless disregard for the truth or falsity of the statements submitted will satisfy the intent requirement. *AmSouth Fin. Corp. v. Warner (In re Warner),* 169 B.R. 155, 162 (Bankr.W.D.Tenn.1994); *First Am. Bank of New York v. Bodenstein (In re Bodenstein),* 168 B.R. 23, 29 (Bankr.E.D.N.Y.1994). The record provides sufficient support for an inference of a reckless disregard on the part of the debtor.

### d. Section 523(a)(4)

The Third Count of RTC's complaint seeks a determination that its debt resulted from the debtor's larceny. Under federal common law, "[l]arceny is proven, for nondischargeability purposes, by a showing that the debtor has willfully taken property with fraudulent intent." *New York v. Kelly (In re Kelly),* 155 B.R. 75, 78 (Bankr. S.D.N.Y.1993). An alternative formulation defines larceny as the felonious taking of another's personal property with the intent to convert it or deprive its owner of the same. *Clarendon Nat'l Ins. Co. v. Barrett (In re Barrett),* 156 B.R. 529, 533 n. 3 (Bankr.N.D.Tex.1993); *see also Faw v. Wiles (In re Wiles),* 166 B.R. 975, 980 (Bankr. M.D.Fla.1994). Larceny requires that, as is alleged here, the initial appropriation of the funds have been wrongful, whereas embez-

zlement occurs when the funds are transferred to a party who is authorized to receive them but who misappropriates the funds once acquired. For the same reasons that summary judgment is improper on the first two counts, it is improper on the third.

 The debtor's assertion that RTC must allege a fiduciary relationship to preclude a discharge on the ground of larceny, *see* Debtor's Memorandum at p. 23, is incorrect as a matter of law. Proof of a fiduciary relationship is not necessary where the ground for nondischargeability is embezzlement or larceny. *Great Am. Ins. Co. v. O'Brien (In re O'Brien)*, 154 B.R. 480, 483–84 (Bankr.W.D.Tenn.1993); *First Nat'l Bank in Blytheville v. Henson (In re Henson)*, 135 B.R. 346, 349 (Bankr.E.D.Ark.1991); *Rech v. Burgess (Matter of Burgess)*, 106 B.R. 612, 621 (Bankr.D.Neb.1989); L. King, ed., Collier on Bankruptcy ¶ 523.14[3] at p. 523–113 (15th ed. 1995).

### 4. Punitive and multiplied damages

The RTC's claim includes punitive damages, statutorily multiplied damages, and interest. Some courts have held that such damages and interest are "obtained" through the debtor's fraud within the meaning of § 523(a)(2) and thus nondischargeable. *See St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 679 (11th Cir.1993); *Sack v. Friedlander (In re Friedlander)*, 170 B.R. 472, 480 (Bankr.D.Mass.1994); *Kibler v. Winters (In re Winters)*, 159 B.R. 789, 790 (Bankr.E.D.Ky.1993). Others have held that only the actual damages are nondischargeable. *Medley v. Owen (In re Owen)*, 181 B.R. 288, 290 (Bankr.W.D.Va.1995); *Stokes v. Vierra (In re Vierra)*, 173 B.R. 417, 418 (Bankr.N.D.Cal.1994); *In re Bozzano, supra,* 173 B.R. at 998. Further, some courts have held punitive damages nondischargeable under § 523(a)(4). *See, e.g., Bugna v. McArthur (In re Bugna)*, 33 F.3d 1054, 1058 (9th Cir.1994); *Brixius v. Christian (In re Chris-*

**9.** In *Grogan v. Garner, supra,* 498 U.S. at 282 n. 2, 111 S.Ct. at 657 n. 2, the Supreme Court suggested in dicta that "those [fraud] judgments that include punitive damages awards are more appropriately governed by § 523(a)(6)." I note that RTC has not alleged a cause of action under

*tian),* 172 B.R. 490, 500 (Bankr.D.Mass. 1994).[9]

I will consider that issue in the event that RTC prevails on one or more of the counts of its complaint.

### ORDER

For the foregoing reasons, RTC's motion for summary judgment is DENIED; the debtor's motion for summary judgment is DENIED; and

IT IS SO ORDERED.

§ 523(a)(6). *See Brown v. Benson (In re Benson)*, 180 B.R. 796, 800–801 (Bankr.W.D.Pa.1995); *Davis v. Williams (In re Williams)*, 173 B.R. 912, 915 (Bankr.W.D.Ark.1994) (punitive damages are nondischargeable under § 523(a)(6)).