In re Charles G. MILLER, Debtor.

Peregrine Falcons Jet Team, A Nevada Corporation, Plaintiff,

v.

Charles G. Miller, Defendant.

Bankruptcy No. 98–31343.
Adversary No. 98–3217.

United States Bankruptcy Court,
D. Connecticut.

Sept. 6, 2002.

Marie A. Casper, Zeldes, Needle & Cooper, Bridgeport, CT, for plaintiff-movant.

Matthew K. Beatman, Zeisler & Zeisler, Bridgeport, CT, for defendant-respondent.

## MEMORANDUM OF DECISION ON MOTION FOR SUMMARY JUDGMENT

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. INTRODUCTION

In this adversary proceeding the Plaintiff seeks to have declared non-dischargeable a debt allegedly owed to it by the

Debtor–Defendant. The Plaintiff has moved for summary judgment based upon, *inter alia*, the alleged preclusive effect of the prior rulings of a Nevada state trial court. For the reasons which follow, the motion for summary judgment will be DE-NIED.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this matter on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(I).

## III. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that summary judgment enter when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

When ruling on motions for summary judgment "the judge's function is not … to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing that there are no material facts in dispute and all reasonable inferences are to be drawn, and all ambiguities resolved in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Rule 9(c) of the Local District Court Rules for the District of Connecticut (hereafter, the "Local Rules") supplements Fed. R.Civ.P. 56(c) by requiring statements of material fact from each party to a summary judgment motion (hereafter, "Local Rule 9(c) Statement(s)"). The material facts set forth in the movant's statement "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party…." D.Conn.L.Civ.R. 9(c)1 (1998).[1]

## IV. FACTUAL BACKGROUND

### A. Sources of Material Facts not in Genuine Issue.

In determining whether there are material facts in genuine issue, this Court looks first to the parties' Local Rule 9(c) State-

---

1. Local Rule 9(c), as applicable to this proceeding, provided in full as follows:

   1. There shall be annexed to a motion for summary judgment a document entitled "Local Rule 9(c)1 Statement", which sets forth in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried. All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 9(c)2.

   2. The papers opposing a motion for summary judgment shall include a document enti-

   tled "Local Rule 9(c)2 Statement," which states in separately numbered paragraphs corresponding to the paragraphs contained in the moving party's Local Rule 9(c)1 Statement whether each of the facts asserted by the moving party is admitted or denied. The Local Rule 9(c)2 Statement must also include in a separate section a list of each issue of material fact as to which it is contended there is a genuine issue to be tried.

   3. The statements referred to above shall be in addition to the material required by these Local Rules and the Federal Rules of Civil Procedure.
   D.Conn.L.Civ.R. 9(c) (1998).

ments. A comparison of those Statements has produced, for the purposes of this contested matter, a body of uncontested facts.

The Plaintiff also directs the Court's attention to the ruling of the Ninth Judicial District Court of the State of Nevada in and for the County of Douglas (the "Nevada Action") in a prior civil action involving the present parties. Those rulings (hereafter collectively, the "Nevada Ruling"), are claimed by the Plaintiff to include determinations entitled to preclusive effect in the present matter. For purposes of this Memorandum of Decision the Court will assume, without deciding, that those determinations are entitled to collateral estoppel effect in this Court.

Additionally, the Plaintiff relies upon certain excerpts of the trial testimony in the Nevada Action of the present Debtor–Defendant. For the purposes of the instant matter, the Court will credit that testimony as true.

From the foregoing sources the Court has compiled a body of arguably material facts which are not in genuine issue *for the purposes of the present contested matter.* These facts (hereafter, the "Record") are as follows:

## B. The Record.

1. The so-called "Peregrine Falcon" was a two-seat, experimental aerobatic jet aircraft developed by Bede Aircraft Co. (hereafter, "Bede"). Bede produced kits for the construction of Peregrine Falcons, and granted rights to market and sell those kits to Point Nine, Inc. (hereafter, "Point Nine"). Charles G. Miller (hereafter, "Miller"), the Debtor–Defendant here, was the President and a 75% shareholder of Point Nine.

2. Bede granted exclusive rights to Fox Jet Corporation (hereafter, "Fox") to build Peregrine Falcons from Bede's kits. Fox's principal was Michael VanWagenen (hereafter, "VanWagenen").

3. In 1994 Fox and Point Nine joined their respective rights under the umbrella of an entity known as Peregrine Flight International (hereafter, "PFI"), which was then able to offer consumers both product and service—the Peregrine Falcon kit and production of a completed jet aircraft from the kit. The shareholders of PFI were Fox and Point Nine. VanWagenen and Miller were directors of PFI; VanWagenen was its President and Miller its Vice President. Both men had access to PFI's financial information and were signatories on its bank accounts.

4. In 1993, James C. Ray (hereafter, "Ray") became interested in acquiring a Peregrine Falcon through his acquaintance with Miller. In or about October of 1993—before PFI had been formed—Ray entered into a letter agreement with Point Nine, and paid $50,000, to be held in escrow by Miller, for an option to buy one Peregrine Falcon. On or about May 12, 1994, Ray exercised his option by entering into a letter agreement whereby he agreed to pay $841,000.00 in scheduled installments to purchase a *constructed* Peregrine Falcon (hereafter, the "First Sale Contract"). Construction of that aircraft was to commence on June 15, 1994, and the $841,000 was to be paid as work progressed, according to the following schedule:

| | |
|---|---|
| June 15, 1994 | $ 200,000.00 |
| July 15, 1994 | $ 150,000.00 |
| Aug. 15, 1994 | $ 122,750.00 |
| Sept. 15, 1994 | $ 122,750.00 |
| Oct. 15, 1994 | $ 122,750.00 |
| Nov. 15, 1994 | $ 61,375.00 |
| Dec. 15, 1994 | $ 35,000.00 |
| Upon delivery | $ 26,375.00 |
| Total | $ 841,000.00 |

5. Sometime later, Ray formed Peregrine Falcons Jet Team (hereafter, the "Jet Team")—the Plaintiff here—and assigned all his rights under the First Sale Contract

to the Jet Team. The Jet Team subsequently entered into its own letter agreement with PFI, dated June 6, 1994, for the purchase of four Peregrine Falcons (hereafter, the "Second Sale Contract"). The Second Sale Contract provided, *inter alia*, that the Jet Team would pay $3,000,000.00 to PFI for the constructed aircraft according to the following schedule as work progressed:

| | |
|---|---|
| July 1, 1994 | $1,000,000.00 |
| Aug. 1, 1994 | $ 400,000.00 |
| Sept. 1, 1994 | $ 400,000.00 |
| Oct. 1, 1994 | $ 400,000.00 |
| Nov. 1, 1994 | $ 300,000.00 |
| Dec. 1, 1994 | $ 300,000.00 |
| Jan. 1, 1995 | $ 200,000.00 |
| Total | $3,000,000.00 |

6. At the time of the First and Second Sale Contracts (hereafter, collectively, the "Contracts"), PFI had not yet completed the construction of any Peregrine Falcon aircraft. However, it, through Fox, was then engaged in the construction of a Peregrine Falcon-type aircraft for Bede, which was being purchased from Bede by a Mr. Harris. Miller referred to this aircraft as the "proof of concept" Peregrine Falcon (hereafter, the "Harris Aircraft"). Miller believed that completion of the Harris Aircraft was crucial to "freeze" the design and technology of the Peregrine Falcon so that PFI would know what parts to purchase for the additional aircraft it was obligated to assemble, *e.g.*, those for the Jet Team.

7. From June through September 14, 1994, the Jet Team made scheduled installment payments totaling $1,995,500 under the Contracts.[2] These payments estab-

lished a "capital account" with PFI (hereafter, the "Capital Account").

8. From such installment payments PFI was paid a sales commissions totaling $127,183 in June and July of 1994. Also from such installment payments, PFI was paid "profits" totaling $100,000 in August and September, 1994.

9. On September 15, 1994, Ray asked Miller for an accounting of the status of construction of the five aircraft and the disposition of the Jet Team capital account. Miller admitted to Ray that little progress had been made on the Jet Team aircraft in comparison to the installments paid, and expressly promised that he would provide the requested accounting. Miller failed to provide the promised accounting, although he could have obtained it from PFI records as early as September or October of 1994.

10. Fox was entitled to draw funds from the Capital Account only as its work on the Jet Team's aircraft progressed. Nonetheless, even though it had made little or no progress on the Jet Team's aircraft,[3] from September through December of 1994, Fox withdrew the following amounts from the Capital Account:

| | |
|---|---|
| September 20, 1994 | $ 55,000.00 |
| September 30, 1994 | $ 45,000.00 |
| October 9, 1994 | $100,000.00 |
| November 2, 1994 | $ 40,000.00 |
| December 13, 1994 | $ 50,000.00 |
| December 29, 1994 | $ 75,000.00 |

11. The monies drawn by Fox from the Capital Account were in fact used to accelerate the work on the Harris Aircraft.

**2.** It is unclear from the Record to what extent this total includes payments due under the First Sale Contract.

**3.** A survey performed by PFI in January of 1995 reported the amount of work accomplished at that time on each of the five aircraft as follows:

| Peregrine aircraft Serial Numbers | Percentage Completion |
|---|---|
| 57 | 14.14% |
| 34 | 2.88% |
| 35 | 1.48% |
| 36 | 0.59% |
| 37 | 0.00% |

12. Bede was responsible for paying Fox/PFI for the labor necessary to assemble the Harris aircraft, but it did not do so. As of September, 1994, Miller knew that Fox, not Bede, was shouldering the substantial labor expenses incident to construction of the Harris Aircraft.

13. As of the first week of December of 1994, Miller knew specifically that Fox was incurring huge cost overruns to construct the Harris Aircraft, and that the Capital Account had been dissipated on expenditures other than the construction of the promised aircraft. During the remainder of December, Miller still did not check on the status of the Capital Account, and allowed Fox to draw an additional $125,000 from the Capital Account as "profits," without informing the Jet Team of the disposition of those funds.

14. On and after September 15, 1994, under Nevada law Ray and Miller were in a "confidential relationship"—similar to a "fiduciary" relationship—under which Miller owed a duty to Ray to "act in good faith and with due regard of ... [his] interest...." [4]

15. The Jet Team's Peregrine Falcons were never delivered; and the Jet Team eventually commenced the Nevada Action against Miller.[5] Following trial, on June 20, 1997, the Hon. Michael P. Gibbons, the presiding judge in the Nevada Action, placed an oral ruling upon the record of that action, and thereafter, on August 20, 1997, entered written *Findings of Fact, Conclusions of Law, and Judgment* in favor of the Plaintiff and against Miller on some, but not all, of the Plaintiff's claims (heretofore, the "Nevada Ruling").

16. On April 7, 1998, Miller filed a Chapter 7 petition with this Court. On July 29, 1998, the Plaintiff commenced the instant adversary proceeding against the Defendant to determine the dischargeability of the debt established by the Nevada Ruling (the "Debt"). Specifically, the Jet Team asserts that the Debt should be deemed non-dischargeable pursuant to the provisions of 11 U.S.C. §§ 523(a).

## V. DISCUSSION

The Plaintiff's Amended Complaint sets forth two alternative grounds for the non-dischargeability of all or part of the Debt – Code Sections 523(a)(2)(A) and 523(a)(4).

### A. Section 523(a)(2)(A).

Section 523(a)(2) provides in pertinent part that—

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services or an extension ... of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition:

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive....

11 U.S.C. § 523(a)(2) (1998).

■ Upon a review and consideration of applicable legal principles the Court con-

---

4. *Perry v. Jordan,* 111 Nev. 943, 900 P.2d 335, 338 (1995)

5. VanWagenen would likely have also been a defendant had he not been killed in a Peregrine Falcon test flight accident.

cludes that the summary judgment record in this matter leaves in genuine issue at least four elements of a cause of action under Section 523(a)(2)—acquisition, conduct, reliance and financial condition.

### 1. Acquisition.

As a preliminary matter, Section 523(a)(2) requires the debtor to *obtain* money, etc. *as a result of* some representational conduct. Even if the Record is read to establish that Miller personally[6] obtained money from the Jet Team, it does not reference any offending representational conduct that *preceded* such acquisition. The offending representational conduct complained of occurred well after Miller might have personally obtained money from the Jet Team. Thus the Record does not support a conduct-acquisition cause-and-effect as required by Section 523(a)(2).

Further, even if Miller could be held liable for money he "obtained" for an entity other than himself, *e.g.,* PFI, the requisite cause-and-effect does not appear in the Record. Specifically, the Record establishes only that (i) the Jet Team's last payment to PFI was September 14, 1994, and (ii) Miller did not know until the first week of December, 1994, that Fox was incurring huge cost overruns to construct the Harris Aircraft, and that the Capital Account had been dissipated on expenditures other than construction of the Jet Team's aircraft (hereafter, "Miller's Receipt of Knowledge"). The only Record harm to the Jet Team which occurred after Miller's Receipt of Knowledge was a transfer of funds from PFI to Fox. Indeed, even as determined in the Nevada Ruling, Miller's neglect of a duty of disclosure did not result in a further enrichment of Miller or

PFI, or induce the Jet Team to part with any additional money; it simply "damaged" the Jet Team's "ability to protect [its] . . . rights as a creditor of PFI."

### 2. Conduct.

Section 523(a)(2)(A) sets out three alternative modes of conduct justifying a determination of the non-dischargeability of a debt, to wit: (i) false representation, (ii) false pretenses, and (iii) actual fraud. These terms of art were used and intended by Congress to incorporate the *general* common-law of such torts; *i.e.* the "dominant consensus" of all jurisdictions, rather than the specific law of any given State. *Field v. Mans,* 516 U.S. 59, 70 fn. 9, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

#### i. Actual fraud

"Actual fraud" is any intentional deceit, artifice, trick, or design used to circumvent and cheat another, *i.e.* something said, done, or omitted with the design of perpetrating what is known by the debtor to be a deception. *See, e.g.,* Am. Jur.2d *Bankruptcy* § 3065 (1991). The Record does not establish, or even tend to establish, beyond genuine issue that Miller's failure of full disclosure was undertaken with the specific design of perpetrating a known deception.

#### ii. False pretenses

"False pretenses" involve a misrepresentation *implied* from purposeful conduct intended to create a false impression. *See, e.g.,* Am.Jur.2d *Bankruptcy* § 3064 (1991). At most the Record supports the proposition that Miller *neglected* to make full disclosure to the Jet Team, not that he engaged in purposeful conduct by which he *intended* to create a false impression.

---

**6.** The Record suggests that *PFI,* through Miller as its agent, obtained money from the Jet Team, then paid *Point Nine* commissions and "profits". Point Nine passed those funds through to Miller.

576

### iii. False representation

A "false representation" is established where a debtor makes a false statement, knowing it to be false, with the purpose of inducing the creditor to act to his detriment in reliance. *See, e.g.,* Restatement (Second) of Torts § 525 (1977); *In re Roberti,* 183 B.R. 991, 1005 (Bankr. D.Conn.1995). A party who conceals material information with the intention of preventing another from acquiring it is subject to the same liability as one who makes a "false representation". *See, e.g.,* Restatement, *supra,* at § 550. A party to a business transaction who fails to disclose to another party a fact that he knows may justifiably induce that party to refrain from entering into a business transaction is subject to the same liability as one who makes a "false representation". *See, e.g.,* Restatement, *supra,* at § 551.

Again, none of these statements of law align with the conduct of Miller as disclosed by the Record. His failure of full disclosure to Ray was not attended by an intention to induce Ray or the Jet Team to act to their detriment or to prevent them from acquiring material information. The Record reveals no concealment; at best it evidences recklessness. Finally, none of Miller's non-disclosure induced Ray or the Jet Team to enter into a business transaction; they already had. As the Nevada Ruling concluded, the non-disclosure merely "damaged" the Jet Team's "ability to protect [its] ... rights as a creditor of PFI."

### 3. Reliance.

To establish a cause of action under Section 523(a)(2)(A), a creditor must also establish his *justifiable reliance* on the subject representation, pretense or fraud. *See Field v. Mans,* 516 U.S. at 73–75, 116 S.Ct. 437. Although the Nevada Ruling finds simple reliance on the part of the

Plaintiff or its principal, Mr. Ray, this Court concludes that the Record fails to suggest, much less establish beyond genuine issue, that such reliance was *justifiable.*

### 4. Financial Condition.

Given the interplay of subsection (A) and (B) of Section 523(a)(2), the only statements regarding *financial condition* which are actionable under that Section are statements made in writing. Stated differently, non-written statements—such as oral communications—regarding financial condition are not within the contemplation of Section 523(a)(2). The only communications established by the Record were non-written.

### B. Section 523(a)(4).

Under the terms of Code Section 523(a)(4), a debt is excepted from a debtor's general discharge if such debt is "for fraud or defalcation while acting in a *fiduciary capacity....*" (emphasis supplied). The concept of "fiduciary capacity" is one ultimately determined by federal law, *e.g., Fowler Brothers v. Young (In re Young),* 91 F.3d 1367, 1371 (10th Cir.1996), and it must arise from an "express or technical trust". *See, e.g., id.* at 1371–72 ("[n]either a general fiduciary duty of confidence, trust, loyalty, and good faith, nor an inequality between the parties' knowledge or bargaining power, is sufficient to establish a fiduciary relationship for purposes of dischargeability." (citations omitted)).

The Record does not reference an express or technical trust; in fact it does not even establish the existence of a fiduciary relationship. The Nevada Ruling finds a "confidential relationship between Miller and Ray on and after September 15, 1994. Yet even the Nevada Ruling acknowledges that under Nevada law such a

relationship is not necessarily a fiduciary relationship, merely 'similar' to one". *Accord Perry v. Jordan,* 111 Nev. 943, 900 P.2d 335, 337–38 (1995).

Accordingly, the Record does not support a conclusion that Miller was in a "fiduciary capacity" vis-a-vis Ray and/or the Jet Team. It is therefore unnecessary for this Court to consider whether there was a "fraud or defalcation".

## V. CONCLUSION

For the foregoing reasons, there remain genuine issues as to material facts in this proceeding. Hence, the Plaintiff's motion for summary judgment shall be DENIED by separate order.